308 A.2d 477.

SMITH DEVELOPMENT CORPORATION *vs.* BILOW ENTERPRISES, INC. *et al.*

MCDONALD'S CORPORATION *vs.* BILOW ENTERPRISES, INC. *et al.*

AUGUST 15, 1973.

PRESENT: Roberts, C. J., Paolino. Powers and Kelleher. JJ.

204

KELLEHER, J. These cases were consolidated for argument here just as they were consolidated for a jury trial in the Superior Court. The plaintiffs are Smith Development Corporation and McDonald's Corporation. Smith Development is a Rhode Island corporation and the owner of a parcel of land located on the easterly side of West Main Road in Middletown. McDonald's is a Delaware corporation and franchises the operation of a nationwide chain of drive-in restaurants. The defendants are Bilow Enterprises, Inc., a Rhode Island corporation, and its

treasurer and a holder of a substantial amount of the corporation's stock, Louis Bilow. The corporate defendant holds a franchise for "Carroll's Hamburgers." It operates a drive-in restaurant on leased land in Middletown on West Main Road just about a mile away from the Smith Development parcel. Hereafter, we shall from time to time refer to the corporate plaintiffs as "Smith" and "McDonald's" respectively, the corporate defendant as "Carroll's" and the individual defendant as "Bilow."

After an extended trial, the jury brought back verdicts for Smith against Carroll's in the amount of $26,500 and against Bilow for $15,000. McDonald's was awarded nominal damages in its suits. The trial justice denied McDonald's motion for a new trial, affirmed the $26,500 award and ordered an additur of $11,500 in Smith's suit against Bilow. Carroll's, Bilow and McDonald's have appealed.

On September 5, 1962 plaintiffs entered into a lease agreement with McDonald's whereby Smith would erect on a portion of its property a drive-in restaurant which would be tailored to the plans and specifications provided by McDonald's. In return, Smith would receive an annual rental of $9,000 for a period of 20 years with the lease calling for two renewals of five years each. The lease was conditioned upon Smith's obtaining a $45,000 construction mortgage. The Rhode Island Hospital Trust Company had conditionally approved the mortgage upon Smith's obtaining approval of the Middletown Planning Board for the proposed endeavor. The bank's counsel was of the opinion that since the lease involved a subdivision of Smith's real estate, approval of the planning board was a necessity.

Smith submitted the proposed subdivision to the planning board. The board considered the plat at a series of meetings held beginning in December, 1962. At one point, the board gave its preliminary approval. However, when

the plans came before the board on August 12, 1963 for final approval, there was a public hearing at which abutting property owners appeared with counsel and expressed their objections. The objectors voiced concern for the safety of the children who attended a nearby elementary school. On August 26, a majority of the planning board voted to disapprove the plat. Most of those voting in the negative rested their decision on the "safety factor."

Smith took an appeal to the Middletown Planning Board of Review. Another public hearing was held. There was another split vote. This time the majority voted to approve the proposed subdivision and permit its recordation. The board gave its approval on October 24, 1963. The abutters then filed a bill of complaint under the provisions of G. L. 1956, §45-23-20, which authorizes the Superior Court to review decisions of planning boards of review. A justice of that court issued an ex parte restraining order prohibiting the recording of Smith's plat. After hearings were held in January and February, 1965, the trial justice dismissed the bill of complaint on the basis that the abutters have failed to prove that the recording of the plat would adversely affect the value or use of their land. On February 23, 1966, we affirmed the dismissal.[1]

Within six months thereafter, Smith and McDonald's initiated this litigation. Since there is error in the instructions given to the jury which is prejudicial to defendants and because there is an erroneous exclusion of evidence in the suit brought by McDonald's, we shall forego any extensive review of the evidence.

The record shows that legal expenses incurred by the abutters in their effort to keep McDonald's Golden Arches out of Middletown were paid by the corporate defendant. The firm that represented the abutters before the planning board, the board of review, the Superior Court and this

---

[1] *Paterson* v. *Corcoran*, 100 R. I. 475, 217 A.2d 88 (1966).

court owns stock in the corporate defendant. One of the members of the firm is Bilow's first cousin, and the secretary of Carroll's.

In their complaint, plaintiffs sought damages on three different grounds—(1) tortious interference with their contractual relationship; (2) maintenance; and (3) abuse of process.

The plaintiffs submitted to the trial justice 39 requests to charge. The defendants presented 28 requests. The trial justice began his charge by giving the "boiler plate." He elucidated on such routine matters as the jury's duty to apply the law as given to them by the court to the facts as they might find them, their right to draw inferences, the burden of proof, and the necessity for a unanimous and impartial verdict. The trial justice had now reached the point in his charge where he was to discuss the law applicable to the issues. At this juncture, he then proceeded to give an almost verbatim reading of 34 of plaintiffs' 39 requests, immediately followed a recitation of 20 of defendants' 28 requests. When the reading was finished, the jury was dispatched to the jury room to begin their deliberations.

Instructing the jury is one of the most important functions of a trial court. The primary purpose of instructing a jury is to assist the jurors in the discharge of their responsibility for finding the facts in issue and then in applying the facts found to the applicable rules of law to enable them to reach a proper verdict. *Pfeiffer* v. *Salas*, Mass., 271 N.E.2d 750 (1971). It is the trial justice's obligation to instruct the jury with preciseness and clarity as to the rules of law that are applicable to the issues raised at trial so that the jury is neither misled nor confused. *Anter* v. *Ambeault*, 104 R. I. 496, 245 A.2d 137 (1968); *Macaruso* v. *Massart*, 96 R. I. 168, 190 A.2d 14 (1963). Instructions should be attuned to the ears and

understanding of the jurors. They are not attorneys but are persons who are selected at random from the community and from all walks of life. They possess varying degrees of academic achievement. The language used in instructing the jury must be appropriately chosen to be helpful to such a group. *Pfeiffer* v. *Salas, supra.* Furthermore, even though a trial justice is not required to sum up' the evidence, he must, if he is to assist the jury, do something more than give a bare statement of legal principles. Rather, he should indicate to the jury how these principles apply to the facts claimed to have been proven. *Vita* v. *McLaughlin,* 158 Conn. 75, 255 A.2d 848 (1969).

There were only two issues that could properly be determined by the jury. As noted earlier, the complaints in these actions listed three counts—tortious interference with contractual relations, maintenance, and abuse of process. No instructions were given relative to the maintenance count. The instructions did, however, embrace two torts not in the case, conspiracy and malicious prosecution. At no time did the trial justice, in his reading of the 34 rules of law given him by plaintiffs, specifically allude to the tort of wrongful interference with contractual rights, define it, and then associate the various rules of law he was reading to that particular tort. The same was true of the count concerning abuse of process.

Over a quarter of a century ago this court said that an intentional and malicious interference with a contractual relationship is actionable. *Local Dairymen's Cooperative Ass'n* v. *Potvin,* 54 R. I. 430, 173 A. 535 (1934). While the' court in *Potvin* made no effort to define the term "malicious," it is now well established that the terms "malicious" and "malice" do not mean that proof is required of a defendant's malevolence, spite, or ill will towards the contracting party or parties, but rather that the words "malicious" and "malice" signify an unjustified in-

terference by one with the contractual relationship of others. Prosser, *Torts* §129 at 927-28 (4th ed. 1971).

At two points in his charge the trial justice correctly defined the term "malice" as being synonymous with "unjustified" but then went on to read, during various portions of the charge, the following statements of law:

> "Ill will or malice on the part of the actor toward the person injured is not an essential condition of liability for interfering with another's business relationship.
> "* * *

> "Malice or ill will is not essential to liability for damages caused by the wrongful initiation of legal proceedings.
> "* * *

> "If you find either or both defendants guilty of interfering with the contract between McDonald's Corporation and Smith Development Corporation, then I charge you to return a verdict for plaintiffs to compensate them for all of the consequences growing out of defendants' acts."

This last statement marked the conclusion of plaintiffs' requests so far as they were applicable to the tortious interference count.

The reading was not presented to a meeting of the bar association. It was given to a group of laymen. The question is not how the instructions read. It is how they sound. We are cognizant of the rule that a charge must be considered in its entirety, but we see no need to put in writing all the rules given to the jury. The charge sounds contradictory. At several points the jurors were told that plaintiffs had to prove a malicious interference, and at other points, they were told that there was no need of proving malice.

The jury was also told that "[a] corporation as well as an individual may participate in a conspiracy and may be held liable for damages caused by acts committed pur-

suant thereto \* \* \*." There is no count concerning a conspiracy. At this moment, the identity of the conspirators is unknown. Are they the defendant corporation and the abutters, or are they the corporation and its law firm? Apart from the identity question, there is another reason for faulting this portion of the charge and it involves fair play. The term "conspiracy," when it is not germane to a case, suggests sinister criminal activity. The reference to conspiracy was erroneous and prejudicial.

At still another part in the charge, the following instruction was read:

> "You will find that the defendants had no right to rely upon the advice of their attorney because he himself was interested in the result of the proceedings as attorney, stockholder and officer of the defendant Bilow Enterprises, Inc."

This instruction is based upon certain language found in a comment following §675 of the First Restatement of Torts. The section deals with the necessity, when suing for malicious prosecution, of showing the absence of probable cause for the issuance of process. The jury, however, was never told that this instruction concerned malicious prosecution.[2] An examination of the comment shows that it speaks of an attorney who is hired on a contingent fee basis. There is no evidence that defendants' attorney's fee was a contingent one. There was no caveat that the allusion to the attorney's interest was to be considered solely as it related to the issue of malicious prosecution—even assuming that the count was properly before the jury. The attorney in question was Bilow's cousin. He testified at

---

[2]It should be emphasized that there is a difference between a claim based upon malicious prosecution and one seeking relief because of an abuse of process. The gist of malicious prosecution is the commencement of an action or the issuance of process without probable cause, while abuse of process concerns itself with process properly issued but used for an end it was not designed to accomplish. *See Manufacturers Supply Co.* v. *Parker,* 103 R. I. 426, 238 A.2d 616 (1968).

trial. His testimony was directed to the counts set forth in the complaints. The mandatory language used by the trial justice could be construed by the jury as an adverse comment on the cousin's credibility. This type of instruction points out the danger of using a string of legal principles which may be correct and proper in the abstract but which has no relevancy to the facts in the actual case being tried or which can mislead and puzzle the jury.

The confusing, contradictory, and erroneous nature of the charge requires a retrial. The plaintiffs have argued that defendants cannot now be heard to complain about the charge because of their failure, when lodging their objections to the charge, to distinctly state the grounds for their objections. Super. R. Civ. P. 51(b). Nevertheless, Rule 51(b) is not to be viewed with an eagle eye as a vehicle for overlooking trial errors. No particular formality is required so long as it is clear that the trial justice had been alerted to possible errors in his charge. Wright & Miller, *Federal Practice & Procedure*: *Civil* §2554 at 648 (1971 ed.). Here, it should have been obvious to the trial justice from the remarks of defense counsel as he listed his objections that the charge had strayed far off target.

Since a new trial is in the offing, we think it proper to list the basic elements of a claim based on a tortious interference with a contractual relationship. Recovery can be had by showing (1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) his intentional interference; and (4) damages resulting therefrom. The burden of proving sufficient justification for interference is upon the defendant. *Long* v. *Newby,* 488 P.2d 719 (Alaska 1971); *Stephenson* v. *Plastics Corp. of America,* 276 Minn. 400, 150 N.W.2d 668 (1967); Prosser, *supra,* §129 at 942. We shall conclude this phase of the

litigation by quoting the following excerpt from 84 A.L.R. 43, 52:

> " 'Interference with Contract Relations,' includes not merely the procurement of a breach of contract, but all invasion of contract relations, so that any act injuring or destroying persons or property which retards, makes more difficult, or prevents performance, or makes performance of a contract of less value to the promisee, may fall within its scope, it may be said that, the interest in a contract being a property right, a party thereto has a right of action against persons who are by their conduct substantially interfering with the performance thereof."

In its suit McDonald's seeks redress for a loss of potential profits it could have earned during the time the fate of its Middletown enterprise was immersed in litigation. The trial justice ordered all testimony concerning the loss of expected profits stricken from the record. We believe that he erred.

The basic requirement for the recovery of loss of profit is that such loss must be established with reasonable certainty. McCormick, *Damages* §26 at 99-100 (1935). "In attempting to meet the requirement of certainty, the plaintiff has various means at his disposal. * * * As with other rules of reasonableness, the degree to which such proof will succeed in establishing the reasonable certainty of profits must depend in a large measure upon the circumstances of the particular case and thus will escape the hard and fast rules of general applicability." 64 Harv. L. Rev. 317, 318-19 (1950).

The defendants, in seeking to uphold the exclusionary ruling of the trial justice, refer us to *Main Realty Co.* v. *Blackstone Valley Gas & Electric Co.*, 59 R. I. 29, 193 A. 879 (1937), where the court alluded to the so-called "new business" rule which holds that, where the business is new, expected estimated profits cannot be recovered as dam-

ages. This statement was pure dicta since the business involved in that case was an established business.

Unquestionably, one of the ways of establishing a loss of profits is by showing the past history of a successful and profitable operation of the business. Although courts have sometimes refused to permit recovery of lost profits on the grounds that the profits of a new business are necessarily too speculative, others have recognized that the question in each case is whether or not the prospective profit loss can be proven with reasonable certainty. *Brenneman* v. *Auto-Teria, Inc.,* 260 Ore. 513, 491 P.2d 992 (1971); *Ferrell* v. *Elrod,* 469 S.W.2d 678 (Tenn. App. 1971); *Standard Machinery Co.* v. *Duncan Shaw Corp.,* 208 F.2d 61 (1st Cir. 1953);[3] 11 Williston, *Contracts* §§1346, 1346A at 249 (3d ed. 1968).

McDonald's marketing research manager had testified. He described the uniformity of procedures utilized at all McDonald's restaurants, its training and national advertising programs, and the efforts made to maintain standards and quality. This witness informed the judge and jury that while in 1962 there were 800 units in operation, this number had increased at trial time to 1,200. He also reported an amazing record of successes—not one restaurant has failed. The trial justice ordered this testimony be stricken.

---

[3]*Standard Machinery Co.* v. *Duncan Shaw Corp.,* 208 F.2d 61 (1st Cir. 1953), involved a Rhode Island contract. The Circuit Court, in pointing out that Rhode Island had no explicit case law which ipso facto bars recovery for loss of profits from a new business undertaking, cited *Zuromski* v. *Lukaszek,* 67 R. I. 66, 20 A.2d 685 (1941), where it was said that where a defendant's wrongful act caused injury to a plaintiff's business, the fact that the plaintiff cannot prove his damages with mathematical certainty will not defeat his right to recover whatever damages the circumstances might "reasonably warrant." The court held that it would not draw a line between the old and new businesses but would look at the record to determine whether or not the prospective profit loss had been shown with the requisite reasonable certainty.

Also excluded was the testimony of the record keeper for McDonald's Eastern Regional Office. She was prepared to introduce earnings and expense figures from McDonald's drive-ins that are situated within a 25-mile radius of the Middletown site. McDonald's was to be paid 9.2 per cent of the gross sales made in Middletown.

The trial justice refused to permit a college professor whose specialty was the business sciences to project and evaluate the sales made in the four Rhode Island-oriented McDonald's drive-ins and then give an estimate as to the loss sustained by McDonald's inability to operate in Middletown. Testimony was introduced to show that the educator's methods are the type relied on and acted upon by the business community.

"[W]here the existence of a loss is established, absolute certainty in proving its quantum is not required." 1 Sedgwick, *Damages* §170A (9th ed. 1912). All that is required is that the court or jury be guided by some rational standard. McCormick, *The Recovery of Damages for Loss of Expected Profits,* 7 N. C. L. Rev. 235, 239 (1929). Many years ago, this court in *Simmons* v. *Brown,* 5 R. I. 299 (1858), recognized that loss of profits, when properly established, could be the proper basis for the award of damages; so, too, we say in the case of McDonald's and its loss of prospective profits.

Having in mind America's acceptance of McDonald's method of merchandising, we believe the requisite evidentiary basis had been established so that the jury could with "reasonable certainty" make a determination of the profit loss sustained as the result of McDonald's lengthy preoccupation, with litigation, rather than the distribution of hamburgers, at its Middletown location. The rulings made in regard to the research manager, the record keeper, and the educator were erroneous.

The appeals of McDonald's, Bilow and Carroll's Ham-

burgers are sustained, the judgments appealed from are vacated and the cases are remanded to the Superior Court for a new trial.

Mr. Justice Powers participated in the decision but retired prior to its announcement. Mr. Justice Joslin and Mr. Justice Doris did not participate.

*Moore, Virgadamo, Boyle & Lynch, Francis J. Boyle,* for plaintiffs.

*Arcaro, Belilove & Kolodney, Kenneth M. Beaver,* for defendants.