**CARDINAL CONSULTING COMPANY, Respondent,**

v.

**CIRCO RESORTS, INC., Appellant.**

**No. 49493.**

Supreme Court of Minnesota.

July 3, 1980.

Rehearing Denied Oct. 30, 1980.

Gray, Plant, Mooty, Mooty & Bennett and Susan L. Lentz, Minneapolis, for appellant.

Mahoney, Dougherty & Mahoney and James M. Mahoney, Minneapolis, for respondent.

Heard before SHERAN, C. J., KELLY and SCOTT, JJ., and considered and decided by the court en banc.

SHERAN, Chief Justice.

Circo Resorts, Inc., a Nevada corporation which operates the Circus Circus Hotel in Las Vegas, appeals from an order denying its post-trial motions[1] after a jury awarded Cardinal Consulting Company, a Minnesota corporation, $71,500 in damages, all but $1,095 of which consisted of lost profits resulting from Circo's breach of contract. Because there is sufficient evidence to support the jury verdict, we affirm.

Viewing the facts in the light most favorable to the prevailing party, as we must on appeal, *Blasing v. P. R. L. Hardenbergh Co.*, 303 Minn. 41, 47, 226 N.W.2d 110, 114 (1975), they can be stated as follows: Cardinal Consulting Company was established by William O'Neill and Wayne Haas in August, 1974, to operate one-stop charter tours (OTCs) to Las Vegas and other holiday areas. Prior to this time both were extensively involved in the travel industry. O'Neill began in travel in 1951 as an employee of North Central Airlines. He later spent time with Swissair and Irish Airlines before owning and managing a number of travel agencies in the Minneapolis area. His previous positions had given him wide experience with charters and familiarized him with the Las Vegas market. From 1971 through 1973 O'Neill also wrote a twice-weekly travel column for the *Green Bay Press Gazette* and produced a weekly program for WCCO–TV, both of which were entitled "Let's Go Travelling." Haas entered the travel industry in 1970 when he and his relatives bought a retail travel agency. From the beginning they were deeply involved in the Las Vegas group travel market, reserving blocks of seats on regular flights between the Twin Cities and Las Vegas during the winter months.

Cardinal was formed to take advantage of the OTC market, a new travel concept that had just been approved by the Civil Aeronautics Board (CAB) in May, 1975. OTCs permitted the organization of charter tours for persons unaffiliated with any organization at prices well below standard fares. To be approved by the CAB, an OTC program had to provide round-trip air transportation between the departure and destination points along with ground transportation and hotel accommodations in the destination city. Participants paid in advance into an escrow account from which the tour operator paid the airline, hotel and ground suppliers prior to the arrival of the guests. The regulations required that at least 20 percent of the amount in escrow

1. Circo moved to set aside the verdict, for judgment notwithstanding the verdict, for a new trial or to eliminate lost profits from the damage award by reducing damages to $1,095.

remain there until two days after the return of the participants, at which time the tour operator received his portion. The entire package of a tour operator had to be submitted to and approved by the CAB before an operator could begin advertising its packages to the public. What made OTCs profitable was that the rented airplane was used back-to-back, i. e., it transported a group to the destination city and picked up the previous group for return to the departure city.

O'Neill and Haas set up their Cardinal Consulting Company in a room in Haas' house, a location that is not at all unusual for this type of business. For capital they took out an $8,000 loan and each put up some of his own money. They initially investigated the possibility of arranging tours to the Caribbean, and to Hawaii, but they decided to concentrate their efforts on the Las Vegas market which appeared to have much greater potential for earning profits. Their idea was to set up an OTC program of consecutive back-to-back flights that would operate from January to April and that would tap the market in smaller cities of the Upper Midwest. Most of these three or four day tours (Thursday-Sunday, Sunday-Thursday) would be distributed to retail travel agencies in such cities and to clubs which would advertise the tour and sign up participants.

In June, 1975, Jay Valentine, the national sales manager of the Circus Circus Hotel came to Minneapolis to solicit OTC business. He contacted Donald Lyons, the regional traffic and sales manager of North Central Airlines. Lyons directed him to Cardinal which had already been in contact with North Central Airlines about arranging charter planes for OTCs between the Upper Midwest and Las Vegas.

Valentine met with O'Neill and Haas to discuss the possible use of the Circus Circus Hotel by Cardinal's tours. O'Neill and Haas explained that they would need 50 rooms from January 11, 1976, through April 22, 1976, to which Valentine agreed. Valentine quoted them a price of $18 per night but promised to investigate whether he could drop the price to $16 during week nights. They also verbally agreed that, because the CAB required all the funds to be in escrow, Cardinal would fully prepay two weeks before arrival when it submitted its rooming list, rather than giving a deposit.

On June 18, 1975, Haas wrote to Valentine confirming Cardinal's request for the 50 rooms at Circus Circus. Valentine responded on July 29, 1975, that Circus Circus was setting aside 50 rooms for the duration of Cardinal's program, and he initiated a "definite booking sheet" which indicated the hotel's definite commitment to provide Cardinal with rooms.

After arranging hotel space, Cardinal contracted with North Central Airlines for aircraft to operate its tours to Las Vegas and with a ground operator in Las Vegas to provide ground transportation to and from the hotel, as required by the CAB for OTC approval. Cardinal's contract with North Central provided that it would pay North Central in full out of the escrow account at least 30 days before the departure date and that only after this could it pay the hotel or other expenses. Cardinal then submitted its proposed tour package to the CAB for approval.

During the period following their meeting with Valentine, O'Neill and Haas also contacted travel agents in smaller cities throughout the Upper Midwest where their reception was very positive. Even though federal regulations did not permit them to advertise to the general public until after they received CAB approval, which only occurred on November 13, 1975, they had been promoting Cardinal tours all year. What made these tours so popular was that they were scheduled to leave from the local community airports, obviating the need to bus participants to Minneapolis for departure. Of the 28 tours planned, O'Neill estimated that ⅔ had been picked up by travel agents, clubs or other organizations, and only a few were to be advertised and filled by individuals in the Twin Cities area.

Early in October, Valentine passed through the Twin Cities and met with O'Neill and Haas to find out how their

promotion was going. He also told them that he had received permission from his superior to offer them a rate of $16 per night from Sunday through Thursday. At this time they informed him that they were having trouble with the first three tours in January which might have to be cancelled. Valentine told them that cancellation would pose no problem because that period was traditionally slow in Las Vegas. They also discussed the possibility of additional rooms and the use of Circus Circus for Cardinal's 1977 tour program. On October 13, 1975, Haas sent Valentine a letter requesting rooms for 1977 and asking to lengthen the period of the 1976 program, but no mention was made of the possible cancellation of the first three tours.

In November, 1975, the management of Circus Circus was reorganized under the leadership of Mel Larson who took the position previously held by Valentine's superior. In an attempt to make the operation of the hotel more efficient and to ensure that all rooms were full, Larson decided to draft formal contracts to govern Circus Circus' relations with all tour operators using its facilities. Valentine was not consulted about the contract Cardinal was asked to sign, which was contrary to the agreement they had negotiated and would make Cardinal's performance impossible.

On December 10, 1975, Valentine called Cardinal from Las Vegas to set up a meeting in Minneapolis for December 13. Haas told Valentine then and on December 13 that Cardinal was cancelling the first three tours. Valentine then told him to put it in writing, which he did in his letter of December 16.

At their meeting Valentine presented Haas with the proposed written contract between Cardinal and Circo, which Haas refused to sign because it did not represent their agreement. Although Valentine agreed to take it back and get it redrafted, Larson refused to alter the contract and took the position that, without the signature of O'Neill and Haas, there was no agreement.

On January 5, 1976, Cardinal received a letter from Circus Circus cancelling the rooms that had been reserved by Cardinal for the entire 1976 season. O'Neill and Haas immediately called Las Vegas, and Larson told them that, since they had refused to sign the agreement, they had no rooms. After notifying all the agents and participants that Cardinal would have to cancel its program because it had lost its hotel booking, they tried again to work something out with Circus Circus. Larson, however, would only let them have the rooms subject to the terms of the contract letter, an offer they refused.

When Cardinal learned of the cancellation on January 5, 1976, the flights scheduled to leave for Las Vegas were not all full. The first departure from Mason City, for which participants had only two remaining days to subscribe, was about 60 percent full, the next flight from Mankato was 40 percent full, and the third flight from Eau Claire was sold out. O'Neill testified that, although most still had space at the time of cancellation, they would all have been full had they been permitted to operate.

After Circo's cancellation, O'Neill and Haas attempted to salvage their tour package. They contacted numerous Las Vegas hotels, and, finally, through their ground operator, they learned that the Marina Hotel, which had just opened, still had rooms available. By the time they got back to their local agents, however, a number of the tours had already been cancelled. Nevertheless, they were able to salvage eight tours which operated at 100 percent capacity, although not back-to-back. Because they had to use the money they would have earned from these tours to cover the charges of bringing back empty planes, Cardinal never made a profit.

The disastrous nature of the 1976 season ruined Cardinal Consulting Company, although in subsequent years the OTC business from the Upper Midwest to Las Vegas flourished. O'Neill and Haas did not sever their relationship with the travel industry, however, and both currently own retail travel agencies.

On appeal from a jury verdict for Cardinal, Circo raises the following issues:

1. Was there a binding contract between Cardinal and Circo that was breached by Circo?

2. Did Cardinal prove lost profits with sufficient certainty to permit recovery?

3. Was the amount of the jury verdict supported by the evidence?

1. Circo takes the position that it did not breach the contract by cancelling the rooms reserved for Cardinal because the contract expressly and by custom recognized the parties' mutual right of cancellation upon 30-days written notice. Alternatively it argues that, if the hotel had no right to cancel, the contract would be void as a matter of law because it lacked mutuality of obligation or consideration.

■ The terms of a disputed contract are for the jury to decide, and an appellate court will not overturn the jury's resolution of factual issues if, on the record, it could reasonably have made such findings. *Kuehl v. Nat'l Tea Co.*, 310 Minn. 48, 50, 245 N.W.2d 235, 237 (1976); *Gilbert v. Brindle*, 306 Minn. 569, 570, 237 N.W.2d 83, 84 (1975). It is not our function to substitute our judgment for that of the jury, even though we might have affirmed a contrary result. *Caledonia Community Hosp. v. St. Paul Fire & Marine Ins. Co.*, 307 Minn. 352, 239 N.W.2d 768 (1976); *Scott-Daniels Properties, Inc. v. Dresser*, 281 Minn. 179, 160 N.W.2d 675 (1968). This is especially true when, as here, the trial court has denied a motion for a new trial.

[A] determination of a fact issue made at the trial level will not be disturbed on appeal where there is a conflict in the evidence and the trial judge has given his approval to the verdict by denying a new trial. It is not the duty of the appellate court to determine the credibility of the evidence, to weigh it, or to resolve conflicts therein. 14 Dunnell Dig. (3 ed.) § 7142; *Brewitz v. City of St. Paul*, 256 Minn. 525, 99 N.W.2d 456.

*Johnson v. Lorraine Park Apts. Inc.*, 268 Minn. 273, 276, 128 N.W.2d 758, 761 (1964).

■ Our perusal of the record convinces us that there was sufficient evidence from which the jury could have found a contract for the reservation of 50 rooms at the Circus Circus Hotel from January 22 to April 29, 1976, which permitted Cardinal to cancel by 30-days notice, oral or written, without according an equal right to Circo. Haas, O'Neill and Valentine, Circo's national sales manager at the time the agreement was made, all testified that they had never discussed the hotel's reservation of a right to cancel the entire contract on 30-days written notice. Although Larson, who replaced Valentine in the Circo hierarchy, claimed that the contract as written merely recited the terms discussed by the parties, the strong, negative response of Haas and O'Neill to the suggestion that they sign it supported a jury finding to the contrary.

■ Similarly, there was sufficient evidence to permit the jury to find that it was not the usual custom and practice in Las Vegas to allow for mutual rights of cancellation by either party upon 30-days written notice. Although Circo introduced expert testimony that all Las Vegas contracts had such clauses, Cardinal's experts disagreed. Moreover, both Valentine and the director of travel at Minnesota AAA explained why tour operators need more cancellation flexibility than hotel operators.[2]

2. Valentine testified as follows:

Q Now, under this agreement that you had entered into for the lease of rooms to Cardinal Consulting, did the hotel reserve the right to cancel them on a thirty day notice?

A Certainly not a thirty day notice. Right to cancel, actually at this point with OTC and other travel operators anyone involved in the sales understood that the lead time involved to an operator to sell his pattern was such that you cannot cancel them on short notice because it virtually kills the program. The start up costs involved, the time, the contact of agents, the contact of sources is such that it would be impossible to cancel. Normally the cancellation comes from the other side, if anything.

Q Well, did the operator—that is my next question—did the operator reserve the right to cancel any particular arrival?

A Yes, the basic reason for the cancellation coming from the other side is it has a dual

Circo's argument that the contract lacked mutuality and, thus, was not binding on the parties has no merit. The concept of mutuality has been widely discredited in contract law, and it is now generally recognized that the obligations of the parties need not be substantially equal for there to be a binding contract. 1 S. Williston, Contracts §§ 105, 105A (3d ed. 1957); 1A A. Corbin Contracts §§ 152, 160, 161, 164 (1963). Moreover, "Minnesota has long recognized the principle that where a contract is supported by valuable consideration (such as a detriment incurred in exchange for a promise * * * ), then a right of one party to terminate it at will does not render it invalid for lack of mutuality." *Clausen & Sons, Inc. v. Theo. Hamm Brewing Co.*, 395 F.2d 388, 391 (8th Cir. 1968).

Although Circo takes the position that Cardinal's interpretation of the contract permitted it to cancel at will without limitation, Cardinal introduced evidence that it recognized and complied with the 30-day cancellation period. Haas and O'Neill testified that they advised Valentine in October that the tours in early January might have to be cancelled, and that they in fact orally cancelled on December 10 and December 13, both of which were within the 30-day cancellation period.[3] Cardinal also maintained that by advertising its relation with Circus Circus it not only acted to its detriment but conferred a

benefit upon Circo, both of which are sufficient to satisfy the consideration requirement. Thus, it was not improper for the court to reject the mutuality argument.

2. Circo next contends that Cardinal's claim for lost profits should have been dismissed because Cardinal was not an established business and could not prove its lost profits with the requisite degree of certainty to support recovery. It attacks the damage award on three grounds: (1) that Cardinal did not prove the fact of lost profits because it could show no past or future profitability; (2) that Cardinal did not prove causation because other factors, such as its undercapitalization and lack of advertising, more plausibly explained its failure; and (3) that Cardinal incorrectly calculated and inadequately documented the amount of lost profits.

The general rule in Minnesota is that damages in the form of lost profits may be recovered where they are shown to be the natural and probable consequences of the act or omission complained of and their amount is shown with a reasonable degree of certainty and exactness. This means that the nature of the business or venture upon which the anticipated profits are claimed must be such as to support an inference of definite profits grounded upon a reasonably sure basis of facts. * * * This rule does not call for absolute certainty.

---

purpose in nature. The hotel naturally wants to protect its rooms, they want them full. You want them full also so you stay in constant contact with each other, try and decide what likely that pattern is like. There is sometimes dropouts and even sometimes you have the ability to book a few more in. By and large it's usually less than the stated amount of people.

Q Well, I think you may have answered this, but I will put the question to you and you can see. Why did the tour operator have the right to cancel when the hotel had no right?

 * * * * * *

A That is simple. Again it's that constant contact between the two to insure that both parties have the numbers arriving. The cancellation of a pattern could be simply because it was unsubscribed and if the flight is not going to go the sooner you find out the faster you can fill those rooms from other sources.

Q So does the hotel request that they get as much notice as possible?

A Absolutely.

Q And in your experience in the sale of hotel rooms to charter groups and so forth it is common for a cancellation of a particular arrival?

A Sure.

Q Does it happen regularly?

A Frequently, particularly during week periods known to be weak. Some periods are so speculative you put the dates out there and try to sell them. Many times agents do not like to work around them. They like to go out and pound the bushes for an off period of time, but it's wishful thinking.

3. Thus, the letter of December 16, 1975, was merely a written statement of what had already been communicated orally.

*Appliances, Inc. v. Queen Stove Works, Inc.,* 228 Minn. 55, 63, 36 N.W.2d 121, 125 (1949) (quoting from *Johnson v. Wright,* 175 Minn. 236, 239, 220 N.W. 946, 948 (1928)). The controlling principle is that speculative, remote, or conjectural damages are not recoverable. *Leoni v. Bemis Co.,* 255 N.W.2d 824 (Minn.1977); *Hornblower & Weeks-Hemphill Noyes v. Lazere,* 301 Minn. 462, 222 N.W.2d 799 (1974); Restatement of Contracts § 331(1) (1932); C. McCormick, Handbook on the Law of Damages § 26 (1935). Our earlier cases held that lost profits of unestablished businesses were not recoverable because they were speculative, remote, or conjectural, and thus incapable of proof, *see, e. g., Village of Elbow Lake v. Otter Tail Power Co.,* 281 Minn. 43, 160 N.W.2d 571 (1968), but this is no longer the law in Minnesota. *See, Leoni v. Bemis Co.,* 255 N.W.2d 824 (Minn.1977).[4] "Although the law recognizes that it is more difficult to prove loss of prospective profits to a new business than to an established one, the law does not hold that it may not be done." *Id.* at 826. As the Nebraska Supreme Court noted in *El Fredo Pizza, Inc. v. Roto-Flex Oven Co.,* 199 Neb. 697, 705, 706, 261 N.W.2d 358, 363–64 (1978),

> The rule that lost profits from a business are too speculative and conjectural to permit the recovery of damages therefor * * * "is not a hard and fast one, and loss of prospective profits may nevertheless be recovered if the evidence shows with reasonable certainty *both* their *occurrence* and the *extent* thereof. * * * Uncertainty as to the *fact* of whether any damages were sustained at all is fatal to recovery, but uncertainty as to the *amount* is not." * . * *
>
> * * * The fact that a business is new is relevant only insofar as that fact affects the certainty of proof of lost profits; it does not establish as a matter of law that damages for lost profits may not be recovered.
>
> (Emphasis in original.)

*See also Vickers v. Wichita State Univ., Wichita,* 518 P.2d 512 (Kan.1974); *Fera v. Village Plaza, Inc.,* 396 Mich. 639, 242 N.W.2d 372 (1976); *Schafer v. Sunset Packing Co.,* 256 Or. 539, 474 P.2d 529 (1970); *Welch v. United States Bancorp Realty & Mortgage Trust,* 286 Or. 673, 596 P.2d 947 (1979); *Smith Dev. Corp. v. Bilow Enterprises, Inc.,* 112 R.I. 203, 308 A.2d 477 (1973).

 While we have not yet addressed the issue of how a new business can prove its lost profits, other courts have suggested substitutes for past profitability that will remove a plaintiff's anticipated profits from the realm of speculation and support such a damage award. *See, e. g., Edwards v. Container Kraft Carton & Paper Supply Co.,* 161 Cal.App.2d 752, 327 P.2d 622 (1958) (past performance as employee plus subsequent success); *El Fredo Pizza, Inc. v. Roto-Flex Oven Co.,* 199 Neb. 697, 261 N.W.2d 358 (1978) (subsequent success); *Butler v. Westgate State Bank,* 3 Kan. App.2d 403, 596 P.2d 156 (1979) (other examples of that type of business); *Alliance Tractor & Implement Co. v. Lukens Tool & Die Co.,* 204 Neb. 248, 281 N.W.2d 778 (1979) (plaintiff's skill and expertise together with proven existence of a market for the product). What is important is that the loss be established with reasonable certainty, *and this depends upon the circumstances of the particular case. Smith Dev. Corp. v. Bilow Enterprises, Inc.,* 112 R.I. 203, 308 A.2d 477, 482 (1973). *Accord, Vickers v. Wichita State Univ., Wichita,* 213 Kan. 614, 518 P.2d 512, 515 (1974).

 We agree with Circo that the evidence relating to lost profits that was presented by Cardinal lacks precision. Nevertheless, we can not say that it was unreasonable for the jury to award lost profits to Cardinal, given the unusual circumstances of this particular enterprise and the devastating effect of Circo's breach.

---

4. Although both parties rely on *Faust v. Parrott,* 270 N.W.2d 117 (Minn.1978), whether the business was an unestablished one was never directly before us there, and no position toward this question was taken in the opinion. In *Faust* we merely restated the general rule of what must be proven to support a damage award for lost profits.

Although Cardinal was able to demonstrate no past or future profitability, one of several substitutes was available in the evidence presented at trial. Haas and O'Neill were portrayed as persons with extensive experience in arranging tours who were also familiar with Las Vegas. They entered the OTC market early with packages that others, such as retail agencies or social clubs, would be selling for them. Moreover, the market they chose was a fertile one. Las Vegas was very popular with the people from the Upper Midwest, and the small cities on which they were concentrating offered an untapped source of tour participants. Temporally, they were planning to operate their tours during the peak tourist period when 75 percent of the Midwest's tourists visit Las Vegas. This same market and time period have been extremely profitable for those travel agencies who began OTC packages the following year. Thus the jury could have reasonably based its decision that Cardinal lost profits either on evidence of the skill and expertise of plaintiff's principals plus the proven existence of a market, *Alliance Tractor & Implement Co. v. Lukens Tool & Die Co.*, 204 Neb. 248, 281 N.W.2d 778 (1979), or on evidence of profitability of OTC programs operated by other travel agencies in the same general geographic area at the same time of year, *Butler v. Westgate State Bank*, 3 Kan. App.2d 403, 596 P.2d 156 (1979).

■ Similarly, the evidence, although weak, supports the inference that were it not for the cancellation by Circo, Cardinal would have been able to fill all its flights, except the first three. The jury could reasonably have based such a finding on the fact that Cardinal sold out the eight trips it actually ran, which could not have been accomplished but for the energy and skill of Haas and O'Neill and the significant unmet demand for a travel service of this kind. That they were able to do so well on such short notice is persuasive to us, particularly because the substituted hotel, being new, lacked the appeal that the better known and advertised Circus Circus Hotel would have had for prospective customers. What is significant is that Cardinal had moved

into a travel field that opened up as a result of a change in CAB regulations and had, by virtue of its contracts with North Central Airlines and Circo, placed itself in control of the essential elements of a successful enterprise. Thus, it was reasonable for the jury to determine that what doomed Cardinal's tour program was the change of management at Circus Circus and the cancellation of the 50 rooms. As the wrongdoer, Circo should not be permitted to evade its liability, just because its wrongful cancellation involved a new business rather than an established one. *Bigelow v. RKO Radio Pictures Inc.*, 327 U.S. 251, 264–65, 66 S.Ct. 574, 579–80, 90 L.Ed. 652 (1946).

■ Moreover, Circo's suggestion that the cause of Cardinal's collapse was not its cancellation but the low capitalization of the enterprise and the lack of advertising is not compelled by the evidence. Cardinal does not appear to have been an enterprise that was dependent upon extensive personnel, capital or advertising. Because travel agencies and clubs located in small, Upper Midwest communities comprised the "market" for its tours and because there was a fairly high demand for economy trips of this kind, after making the initial flight and accommodation arrangements, O'Neill's and Haas' principal task was to contact the agencies which would make the availability of these trips known to their clients. Moreover, although Cardinal's capital was limited, the business depended more on the character and personality of the entrepreneurs than on the amount available either for investment or advertising. It was their standing in the tour operator community that enabled them to obtain charter planes from North Central Airlines and to persuade Circo to reserve the 50 rooms more than six months in advance. If they were able to conclude these agreements with the principal suppliers of the travel and lodging services needed to make the 1976 season successful, their limited capital is determinative of nothing.

■ Circo also challenges the manner in which Cardinal attempted to prove

its case. It contends that lost profits signify lost net profits which can only be determined if plaintiff introduces evidence of expenses saved as a result of nonperformance, *Periodical Press Co. v. Sherman-Elliott Co.*, 143 Minn. 489, 174 N.W. 516 (1919); *Wilhelm Lubrication Co. v. Brattrud*, 197 Minn. 626, 268 N.W. 634 (1936); *Benfield v. H. K. Porter Co.*, 1 Mich.App. 543, 137 N.W.2d 273 (1965); *Schubert v. Midwest Broadcasting Co.*, 1 Wis.2d 497, 85 N.W.2d 449 (1957), and that the only way of showing expenses saved is through the use of expert financial evidence. *Tonchen v. All-Steel Equip., Inc.*, 13 Ill.App.3d 454, 300 N.E.2d 616 (1973). These rules, however, have numerous exceptions. Thus, plaintiff may be awarded damages on the basis of its anticipated gross profits if the breach has not significantly reduced overhead, *Edwin K. Williams & Co. v. Edwin K. Williams & Co.—East*, 542 F.2d 1053, 1062 (9th Cir. 1976); *Buono Sales, Inc. v. Chrysler Motors Corp.*, 449 F.2d 715, 719–20 (3rd Cir. 1971), and expert testimony is not always required to prove lost profits, especially when the plaintiff is himself, as here, an expert in his field, *Nelson v. Cail*, 120 Ariz. 64, 583 P.2d 1384 (1978); *Power Equip. Co. v. Fulton*, 513 P.2d 234 (Colo.App.1973); *Alliance Tractor & Implement Co. v. Lukens Tool & Die Co.*, 204 Neb. 248, 281 N.W.2d 778 (1979); *Schafer v. Sunset Packing Co.*, 256 Or. 539, 474 P.2d 529 (1970); *Schubert v. Midwest Broadcasting Co.*, 1 Wis.2d 497, 85 N.W.2d 449 (1957).

Here, Cardinal really had no saved expenses, because it attempted to mitigate its damages by running as many of its tours as it could using the Marina Hotel. Furthermore, once one accepts that the flights would have been full, it is relatively easy to calculate the profits. As the trial court explained in its memorandum denying defendant's post-trial motions, "although the Plaintiff did not present its damages in a classical manner, all of the elements and factors as to the expenses and losses of the Plaintiff were in fact submitted to the jury for their consideration."

3. Finally, Circo contends that the damage award was excessive and seeks either a reduction of the amount or a new trial on the issue of damages. The general rule in Minnesota, however, is that the trial court has broad discretion in determining whether defendant should get a new trial for excessive damages. *Lambertson v. Cincinnati Corp.*, 257 N.W.2d 679, 684 (Minn. 1977); *Bisbee v. Ruppert*, 306 Minn. 39, 235 N.W.2d 364 (1975). "[T]he primary responsibility for the reduction of excessive damages lies in the trial court, and * * * a trial court's ruling on this point will only be disturbed where a clear abuse of discretion is demonstrated." *Bigham v. J. C. Penney Co.*, 268 N.W.2d 892, 898 (Minn.1978).

Of the total verdict of $71,500, $69,595 consisted of lost profits. The court was satisfied that this figure represented what Cardinal lost by not being able to run its tour package from January 22, 1976, until April 25, 1976, with its costs fixed as they were on January 5, 1976, when Circo wrongfully breached the contract. We do not believe it abused its discretion in so determining.

Affirmed.

OTIS, J., took no part in the consideration or decision of this case.