David **WOOLER**

v.

Scott **HANCOCK.**

No. CIV.A. 96–106B.

United States District Court,
D. Rhode Island.

Nov. 7, 1997.

Robert Mann, Mann & Mitchell, Providence, RI, for David Wooler.

Marc DeSisto, DeSisto Law Offices, Providence, RI, for Scott Hancock.

### ORDER

TORRES, District Judge.

The recommendation contained in the Report of Magistrate Judge Lovegreen dated June 24, 1997, is hereby accepted.

### REPORT AND RECOMMENDATION

LOVEGREEN, United States Magistrate Judge.

The plaintiff, David Wooler, filed this diversity action alleging that the defendant, Scott Hancock, tortiously interfered with Wooler's contractual employment relationship with his former employer. The face of the complaint satisfies the requirements set forth in 28 U.S.C. § 1332(a): Wooler is a Rhode Island resident, Hancock is a Maryland resident, and the amount in controversy exceeds the statutory minimum. Hancock now moves for summary judgment pursuant to Federal Rule of Civil Procedure 56(c). This matter has been referred to this court for preliminary review, findings, and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Local Rule of Court 32(c). A hearing was held on June 10, 1997. After weighing the arguments of counsel and the memoranda submitted, in addition to conducting independent research, I recommend that Hancock's motion be granted.

### Factual Background.

The following facts are not in dispute. The Wilson Publishing Company employed Wooler as a newspaper reporter for the Narragansett Times from April 15, 1994 until he was dismissed on March 3, 1995. During that period, Wooler wrote many articles, often published as the lead story and occasionally accompanied by his own photographic work. Wooler primarily covered the Town of Narragansett. Wooler frequently investigat-

ed and reported stories questioning the conduct of certain municipal officials.

One such instance led Scott Hancock, then the Town Manager of Narragansett, to meet with Mr. Frederick Wilson, III, the owner of Wilson Newspapers and publisher of the Narragansett Times, in October 1994 to complain about Wooler's reporting. At the meeting, Hancock bemoaned both the method and substance of Wooler's reporting. Hancock deemed Wooler's style intrusive, rude, and otherwise inappropriate; he regarded Wooler's stories as "too negative" and stated that he was otherwise "not a good reporter." Compl. at ¶ 11. Hancock requested that Wilson transfer Wooler to another beat. One or two months later, Wilson and Hancock met for lunch at Wilson's request. At that meeting, the two discussed the balance of coverage at the Times; Hancock asked Wilson to publish "more positive stories about good things that were going on in Narragansett." Wilson Dep. at 26.

Exercising his plenary authority to terminate employees of the Narragansett Times, Wilson fired Wooler on March 3, 1995. Almost one year later, Wooler instituted this lawsuit claiming that Hancock's complaint to Wilson constituted a tortious interference with Wooler's employment contract. Hancock seeks summary judgment on the ground that Wooler is unable to establish the necessary causal connection linking Hancock's complaint to the termination. Hancock further argues that Wilson fired Wooler for a number of job-related problems caused by Wooler's fixation with investigative journalism. In support Hancock proffers the extensive deposition testimony of Wilson and Betty Cotter, then the editor of the Times.

In opposition, Wooler disputes that he was fired for job-related reasons because, he argues, his performance at the Times was satisfactory. In support he cites the "essence" of his own one-page affidavit which states: "I believe that at all times, when considering the length and nature of my stories, my production, as reflected in the attached document, met the requirements of my job." Wooler Aff. ¶ 4. A production tally attached to his affidavit indicates that Wooler wrote eighty-seven stories which appeared in twen-

ty-two issues of the Times, an average of about four stories per issue. Wooler also claims to have "smoking gun" evidence contradicting Wilson's proffered reason for termination: the Notice of Decision on his application for state unemployment benefits states that "[t]he claimant states that he was discharged for *philosophical differences* with his supervisor. The employer representative verifies the claimant's statement." Pl's. Mem. in Opp'n to Mot. for Summ. J., Ex. 1 (emphasis added). Wooler asserts that he has produced enough evidence to create a genuine issue of material fact as to the real reason for his termination, thereby staving off summary judgment.

### Summary Judgment Standard.

Our rules of civil procedure state that a party shall be entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Hence, "a party seeking summary judgment [must] make a preliminary showing that no genuine issue of material fact exists. Once the movant has made this showing, the nonmovant must contradict the showing by pointing to specific facts demonstrating that there is, indeed, a trialworthy issue." *Nat'l Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (1st Cir.), *cert. denied*, 515 U.S. 1103, 115 S.Ct. 2247, 132 L.Ed.2d 255 (1995). An issue is "genuine" when a "reasonable jury, drawing favorable inferences, could resolve the fact in the manner urged by the nonmoving party"; a "material" fact is a "contested fact that has the potential to alter the outcome of the suit under the governing law if the controversy over it is resolved satisfactorily to the nonmovant." *Blackie v. State of Maine*, 75 F.3d 716, 721 (1st Cir. 1996).

### Discussion.

■ Rhode Island common law recognizes as actionable the tort of intentional and malicious interference with a contractual re-

lationship. *Smith Dev. Corp. v. Bilow Enters., Inc.*, 112 R.I. 203, 308 A.2d 477, 480 (1973). To establish such a claim the plaintiff must show (1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) his intentional interference; and (4) damages resulting therefrom. *Id.*, 308 A.2d at 482; *see Ocean State Physicians Health Plan, Inc. v. Blue Cross & Blue Shield of Rhode Island*, 883 F.2d 1101, 1113 (1st Cir.1989). As contemplated under this tort, the notion of "malice" does not mean that the defendant's interference need be spiteful or illwilled, but simply unjustified. *Mesolella v. City of Providence*, 508 A.2d 661, 669–70 (R.I.1986). With this in mind, "[o]nce the plaintiff has proven the four elements, the burden shifts to the defendant to justify its actions." *URI Cogeneration Partners, L.P. v. Bd. of Governors for Higher Ed.*, 915 F.Supp. 1267, 1289 (D.R.I.1996); *see e.g. Ocean State Physicians*, 883 F.2d at 1113. However, this case need never reach the justification phase because the court finds that Hancock has demonstrated, and Wooler has failed to rebut, an absence of genuine issues of material fact on the issue of causation, thereby warranting entry of summary judgment.

■ As an initial matter, the Rhode Island Supreme Court has recognized that a claim for intentional interference with an employment contract like Wooler's, i.e., one terminable at will [1], is more properly pressed as a claim for tortious interference with *prospective* contractual relations. *Roy v. Woonsocket Inst. For Sav.*, 525 A.2d 915, 919 & n. 4 (R.I.1987) (citing Restatement (Second) of Torts § 766 (1979) which states: "One's interest in a contract terminable at will is primarily an interest in future relations between the parties, and he has no legal assurance of them."). Fortunately for the plaintiff, Rhode Island has recognized such a tort since the decision in *Fed. Auto Body Works, Inc. v. Aetna Cas., & Sur. Co.*, 447 A.2d 377 (R.I.1982). To prove his claim Wooler must establish: (1) the existence of a business relationship or expectancy; (2) knowledge by

---

**1.** Wilson stated that no actual employment contract exists. Wilson Dep. at 35. Wooler has not come forward with any evidence of such a con-

tract. Therefore, the court deems Wooler an employee terminable at will.

the interferer of the relationship or expectancy; (3) an intentional act of interference; (4) proof that the interference caused the harm sustained; and (5) damages. *Mesolella*, 508 A.2d at 669. The only practical difference between the two torts is the former's requirement that an actual contract exist. *Id.* at 670.

### A.

■ With this technical matter to the side, the court will proceed to the heart of the motion. Hancock's motion challenges Wooler's ability to establish the causal connection, actual or proximate, necessary to prevail on the claim for tortious interference with (prospective) contractual relations. Hancock argues that "[a]s a matter of law, plaintiff will not be able to prove this element because the person responsible for plaintiff's termination has stated under oath that the defendant had nothing to do with his decision to terminate the plaintiff. In fact, plaintiff's job performance was responsible for his termination." Def.'s Mot. Summ. J. at 5. In his deposition, Wilson flatly testifies that the Hancock complaint did not prompt the decision to fire Wooler, but, on the contrary, may have extended the duration of his employment.

Q You have indicated that it's not unusual to receive complaints about reporters from everybody?

A Right.

Q You had the authority to terminate David Wooler because you were the publisher of the Narragansett Times, correct?

A That's correct.

Q And, you made the decision?

A That's correct.

Q You and only you?

A Right.

Q And, was your decision effected in any way by Scott Hancock?

A No. In point of fact, he probably extended David's employment.

Q And, in what way would he have extended David's employment?

A Because I would never have let the town manager think he could dictate who to hire and who to fire or have any appearance that he was running the newspaper.

Q Is it your testimony you would have fired him earlier if not for the complaints?

A Probably.

Wilson Dep. at 32–33.

Q Now, you testified that you met with Scott Hancock on two occasions?

A Yes.

Q You never met socially or anything with him other than that?

A Never.

. . . .

Q And, did Scott Hancock, in any discussion you had with him, ever ask that the plaintiff be terminated?

A No, he did not.

. . . .

Q I'm going to read you something from the complaint, paragraph 13, which indicates, "As a direct and approximate result of the conduct of the Defendant, . . .", meaning Scott Hancock, ". . . Plaintiff was terminated from his position as a reporter with the Narragansett Times." Is that a correct statement?

A That's totally incorrect.

*Id.* at 35–36. Wilson instead attributes his decision to fire Wooler to job-related problems associated with Wooler's approach to investigating and reporting.

Q Your basis for terminating the Plaintiff was what?

A Job performance.

Q Are there a certain amount of stories or quantity of stories that a reporter in David Wooler's position had to get out per issue?

A That's correct.

Q And, what was that number?

A Normally five or six stories an issue.

Q Was he making five or six stories an issue?

A He was not.

Q Did that create some problems in the paper?

A That created a significant problem with the staff.

Q Meaning what?

A They felt that he wasn't carrying his fair share of the load and he wasn't covering the town the way I wanted the town covered. He was ignoring significant portions of events.

Wilson Dep. 33.

... David [Wooler] wanted to do a job that we didn't have a position for at the paper. * * * He wanted to be an investigative reporter. * * * We have—We assign one reporter to a town. That reporter has to cover all the aspects of the town, whether they're civic—everything except for sports, and David wanted to focus on town government. He was convinced that things were not on the up and up in Narragansett, and he wanted to explore that and do more and more stories, and I didn't have any problem with that. My problem was what the volume of stories was. He just wasn't producing very many stories and spending a tremendous amount of time that didn't result in a story that week. It may result in a story down the road, but we couldn't approach it that way. We didn't have the luxury to do that. We needed three, four, ten or twelve stories a week for Narragansett and David wasn't doing that, and that was causing a problem in the office. Other people felt he wasn't carrying his share of the load.

Wilson Dep. at 15–16. Later, Wilson reiterates that Wooler was fired because

... [H]e wasn't doing his job. He was a disruptive influence in the office. He didn't respect his editors and he wanted a job that I didn't want him to do. * * * [He wanted to be an] [i]nvestigative reporter. I wanted him to be a general assignment reporter, covering the Town of Narragansett, which he wasn't doing to my satisfaction or his fellow employees' satisfaction or his editors' satisfaction. That's the sole reason he was terminated.

*Id.* at 41.

A normal reporter would be expected to right [sic] five, six, seven stories per issue, which per week, in the Narragansett Times, would amount to ten or twelve stories a week, and David wasn't doing that because he got involved in some stories that took a lot more time. So, a lot of areas of town weren't being covered ... [such as] the social news, individual features.

*Id.* at 42. In addition, the one annual review of Wooler's performance indicates that, while ranked average to good in other areas, he lacked the ability to meet deadlines and his story quantity was below average. *Id.* at 10, 41. Considering that the Times was the only paper in the Wilson newspaper family published twice per week, its "reporters have a significantly larger burden to carry." Wilson Dep. at 14. Consequently a shortfall in story production can seriously impact the newspaper.

Much of Wilson's testimony is corroborated by the less probative, yet still relevant, deposition testimony of the newspaper's editor at the time:

Q Why was Mr. Wooler fired?

A I can guess.

Q Well—

A You want me to tell you my opinion? I didn't fire him so it would be my opinion.

Q The answer is I don't know because I didn't have anything to do with firing him?

A Yes.

Q That decision was made by Mr. Wilson?

A Yes.

Q Mr. Wilson never told you otherwise or you would know why he was fired, correct?

A Yes.

Q As we stand here today you don't know why he was fired, correct?

A That's correct.

Q Do you have an opinion as to whether or not there was just cause to fire him based upon what you do know?

A   Can I ask a question about that question?

Q   No.

A   I do have an opinion.

Q   Okay. Is your opinion that there was just cause to fire him based upon what you do know.

A   Yes.

Q   There was just cause to fire him?

A   Yes.

Q   What was the just cause to fire him?

A   He was not doing his job.

Q   Not doing his job meaning what?

A   He was not producing the stories that needed to be done.

Q   .... Apart from that, not doing the stories he was supposed to do, if a reporter is disruptive or abusive at least in the editor's eyes, his supervisor's eyes, is that just cause to terminate someone?

A   Yes.

Q   And did you hear from Mrs. McGreen[2] that he was disruptive and abusive and not cooperative with her?

A   Yes.

Q   This alone would be just cause to terminate him?

A   Yes.

Cotter Dep. 67–68.

Throughout her supervision of Wooler, Cotter was dissatisfied with Wooler's ability to meet deadlines, as evinced by her annual performance appraisal. *Id.* at 19–21. Like Wilson, Cotter attributes this problem to Wooler's time-consuming devotion to investigating the dirty laundry of several Narragansett political figures, the effect of which was to create a rift between himself and fellow newspaper employees. *Id.* at 41–42, 55–57. Cotter describes Wooler's behavior toward some coworkers just prior to his termination as abusive, disruptive, uncooperative, and disrespectful. *Id.* at 55–57, 68. Cotter also

envisioned by Wilson and states that such conflict caused Wooler's termination.

[Wilson] firmly believed that the Narragansett Times was a community newspaper. He used that phrase over and over again and he believed the newspaper had to reflect the community in its totality meaning everything, not just the municipal town hall news, but everything going on in the community, things that were happening to average citizens that might not have anything to do with government.

*Id.* at 57–58.

To overcome his burden, Hancock need only produce sufficient evidence to demonstrate that he did not play a causal role in Wooler's termination. The Wilson and Cotter depositions clearly indicate that Hancock's lone complaint did not cause Wilson to fire Wooler. Ironically, when asked about what, if any, effect Hancock's complaint had on the decision to fire Wooler, Wilson stated that it probably prolonged Wooler's employment because he would not allow a politician to dictate the employment decisions of the newspaper or permit the perception that this had occurred. What emerges from the record is the portrait of a reporter fired for reasons stemming from his fixation with investigating stories of political malfeasance in Narragansett. Wilson's problems with Wooler did not involve the subject-matter of his investigations *per se,* but rather by focusing so much time on the investigation-intensive area of political malfeasance Wooler ignored other types of stories which the publisher deemed important for the community. In addition, that sort of reporting, while no doubt valuable, produced a quantity of stories at a frequency too low to satisfy the needs of the Times. This problem, in turn, caused Wooler to miss deadlines and forced his co-reporters to pick up his slack, thus creating an angry, disrupted work atmosphere. This evidence strongly supports an alternative cause for Wooler's termination. Hancock's proffers more than suffice to demonstrate a lack of a causal connection be-

---

**2.** Marybeth Reilly–McGreen served as acting editor for the Times while Cotter was out on maternity leave for part of the winter in 1994–1995.

tween his complaint to Wilson and the firing of Wooler.

### B.

Hancock's burden fulfilled, Wooler must contradict the showing by pointing to specific facts which could reasonably indicate that Hancock caused Wilson to fire Wooler. The only evidence in the record which speaks to that end is the October 1996 meeting between Hancock and Wilson at which Hancock complained that Wooler's stories were too negative and objected to Wooler's style of investigative reporting. Hancock, however, did not petition for Wooler's termination, but simply requested that he be transferred to another beat. The alleged causal connection is further weakened by the fact that over four months elapsed between the meeting and the date of Wooler's termination. Most importantly, Wooler produces no evidence to rebut Wilson's deposition statement in which he plainly stated, under oath, that the Hancock complaint did not cause him to fire Wooler, but most likely extended Wooler's employment because Wilson would "never have let the town manager think he could dictate who to hire and who to fire or have any appearance that he was running the newspaper." Wilson Dep. at 32.

In search of a trialworthy issue on his state law tort claim, Wooler follows the unconventional tack of arguing that Wilson's stated reasons for firing him are merely a pretext for acting upon the Hancock complaint. In doing so Wooler analogizes his claim to one for employment discrimination and, thereby, urges the court to analyze it under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–05, 93 S.Ct. 1817, 1824–26, 36 L.Ed.2d 668 (1973) (employee must first prove a *prima facie* case for unlawful employment discrimination; then the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions; that done, the employee must prove that the proffered reason is pretextual).

It is factual and legal misadventure to analogize Wooler's suit with one for employment discrimination. First, Wooler has not alleged any imaginable form of wrongful termination of employment. Second, Wooler has not named Wilson or the newspaper as a defendant. Third, it would be entirely inappropriate to superimpose a federal analytical framework upon a purely state law tort claim, here on diversity jurisdiction. Fourth, under Rhode Island common law, once a *prima facie* case of intentional interference with contract is established, justification for the interference (e.g., legitimate business competition) is a complete defense whereas, under federal decisional law, a legitimate nondiscriminatory reason for terminating an employee is only an intermediate step, rebutting a presumption of unlawful employment discrimination. Even if the court could overlook these fundamental problems, Wooler's insistence that he has established pretext under the *McDonnell Douglas* paradigm is a pipe dream considering that he cannot prove the causation element of his *prima facie* case.

Wooler offers two documents which purportedly raise a genuine issue as to the actual cause of Wilson's termination decision. Neither submission fulfills that task. First, there is Wooler's own affidavit which states: "I believe that at all times, when considering the length and nature of my stories, my production, as reflected in the [production tally], met the requirements of my job." Wooler Aff. at ¶ 4. Wooler's personal "beliefs" on this score are irrelevant. The correct focus is upon what Wilson thought of Wooler's production and whether the decision to terminate was influenced by the Hancock complaint. Clearly, as reflected in the depositions and in the annual performance appraisal, Wooler's average production quantity (four stories per issue) fell below the minimum required production quantity (five or six stories per issue). The evidence indicates that Wilson blamed the shortfall on Wooler's time-consuming efforts spent on investigative reporting.

Second, there is the so-called "smoking gun" evidence: on the Notice of Decision as to Wooler's application for state unemployment benefits, it states that he was fired for "philosophical differences with his supervisor." Pl's. Mem. in Opp'n to Mot. for Summ. J., Ex. 1. Wooler argues that this document

**54**

shows that he was fired for reasons unrelated to his job performance. However, the undisputed evidence reveals a direct relationship between Wooler's "philosophical differences" with Wilson and his lagging story production. As previously discussed, Wooler concentrated his reporting time and effort on investigations of political malfeasance in Narragansett. Wilson stated that such approach was at odds with his reporting philosophy: "I wanted him to be a general assignment reporter, covering the Town of Narragansett, which he wasn't doing to my satisfaction or his fellow employees' satisfaction or his editors' satisfaction. That's the sole reason he was terminated." Wilson Dep. at 41.

In sum, Wooler utterly fails, in light of Hancock's showing, to produce *any* evidence demonstrating that Hancock played a causal role in the termination from the newspaper.

### Conclusion.

For the foregoing reasons, Hancock's motion for summary judgment should be granted. Any objection to this Report and Recommendation must be specific and must be filed with the Clerk of Court within ten (10) days of its receipt. Fed.R.Civ.P. 72(b); Local Rule of Court 32. Failure to file specific objections in a timely manner constitutes a waiver both of the right to review by the district court, *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603, 605 (1st Cir.1980), and the right to appeal the district court's decision, *United States v. Valencia–Copete*, 792 F.2d 4, 6 (1st Cir.1986) (per curiam). June 24, 1997.