[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] DECISION
Before this court are three pretrial motions together with corresponding objections. The Parking Company, L.P. (hereinafter "Plaintiff" or "TPC") moves to dismiss the first three counts of the Defendant's Counterclaim. Additionally, New England Parking Company, L.P. (hereinafter "Third Party Defendant" or "NEP") moves to dismiss the Third Party Complaint in its entirety. Finally, Rhode Island Airport Corporation (hereinafter "Defendant" or "RIAC") moves for a judgment on the pleadings as to the first two counts of the Plaintiff's Amended Complaint. The motions are made in accordance with Super. R. Civ. P. 12 (b)(6) and 12(c).
 FACTS AND TRAVEL
The claims, counterclaims and third party claims in this case arise from a contract dispute relative to the operation and control of the parking facilities at the Theodore Francis Green Airport (hereinafter the "airport"). Plaintiff attached to its Amended Complaint, and incorporated by reference therein, the agreements in question: the socalled Concession Lease Agreement (including five amendments thereto) and the Audit Agreement (referred to herein collectively as the "CLA").[1] The pertinent facts gleaned from the parties' pleadings[2] are set forth herein, and form the factual context for the determination of these motions.
Current parking amenities at the airport include three garages. Plaintiff, a limited partnership, is under contract to operate two of the garages, identified as Garages A and B. Pursuant to the Fourth Amendment to the CLA, TPC owned and operated Garage B as the "Express Valet Garage." Additionally, TPC manages and operates Garage A and other surface area parking lots. Defendant, a public corporation established in accordance with G.L. 1956 § 42-64-7.1, is a subsidiary of the Rhode Island Economic Development Corporation (hereinafter "EDC"). RIAC leases the land on which the airport is located and operates the airport. The Third Party Defendant, NEP, is a separate limited partnership entity that is closely affiliated with TPC.[3] NEP owns and operates the garage identified as Garage C which is adjacent to the airport and accessible from airport property. On April 21, 1998, RIAC and NEP entered into an Easement Agreement, which is attached and incorporated by reference in the Third Party Complaint, whereby RIAC granted NEP an easement for Garage C to access the so-called "Airport Circulator" in exchange for a percentage of Garage C revenue. The CLA expires on or about December 17, 2007, at which time the agreements provide that Garage B, the property owned by TPC, "shall be conveyed to the State by good and sufficient bargain and sale deed, without any further consideration, free of liens and free of encumbrances." (CLA, Article II (C))
A dispute has arisen between the parties relative to revenue sharing, the calculation of fees and expenses, and the maximization of use of the parking facilities, which, prior to the commencement of this action, resulted in the condemnation of a temporary easement in Garage B on July 28, 2004.[4] For purposes of this decision, other relevant facts, as alleged by the opposing party's pleading, are considered as each motion is addressed.
TPC's claims against RIAC are contained in four counts of the Amended Complaint. Count I is for termination due to Defendant's alleged material breach of the CLA. Count II is for damages allegedly caused by RIAC's breach of contract, including claims for breaches of the covenant of quiet enjoyment, the exclusive parking concession, operation of a new facility, the covenant on parking rates, and the agreement to use alternative dispute resolution. Count III is for breach of the implied covenant of good faith and fair dealing. Count IV seeks a declaratory judgment as to the interpretation of the parties' agreements relative to shuttle bus expenses, credit card expenses, and audit procedure.
RIAC answered, raised certain affirmative defenses, and filed both counterclaims and third party claims. In Count I of its Amended Counterclaim, RIAC seeks to enjoin TPC from sharing information about the parking revenues, alleging that the dissemination of that information results in a violation of the Rhode Island Trade Secrets Act. Count II alleges damages relating to the alleged violation of the Trade Secrets Act. In addition, the Amended Counterclaim contains counts seeking damages for breach of a related mediation agreement, and damages for breach of contract relating to certain alleged breaches of the CLA and its amendments. In its Third Party Complaint against NEP, RIAC alleges tortious interference with contract, violations of the Trade Secrets Act, and breach of the Easement Agreement.
 TPC'S MOTION TO DISMISS
TPC moves to dismiss Counts I, II and III of RIAC's Counterclaim. Both Counts I and II of the Defendant's Counterclaim assert that the Plaintiff has violated the Rhode Island Trade Secrets Act by sharing certain defined "parking financial data" with the Third Party Defendant, NEP. Count III of the Counterclaim alleges that Plaintiff violated the parties' agreement not to disclose the fact that the parties had engaged in mediation, as contained in a separate mediation agreement executed in 2004.
Standard of Review.
In determining whether to grant a Rule 12(b)(6) motion to dismiss, this Court "assumes the allegations contained in the complaint to be true and views the facts in the light most favorable to the [non-moving party]."Giuliano v. Pastina, Jr., 793 A.2d 1035, 1036 (R.I. 2002) (quoting Martinv. Howard, 784 A.2d 291, 297-98 (R.I. 2001)). This Court should not grant the motion "unless it appears to a certainty that [the non-moving party] will not be entitled to relief under any set of facts which might be proved in support of [their] claim." Id. at 1037 (quoting Bragg v. WarwickShoppers World, Inc., 102 R.I. 8, 12, 227 A.2d 582, 584 (1967)).
Counts I and II.
The main thrust of Plaintiff's argument is that the parking financial data is the Plaintiff's own property and, as such, cannot possibly be considered Defendant's "trade secret." Plaintiff cites to the language of the statute,[5] which requires that the trade secret be "of another," and to the language of the Audit Agreement,[6] which the Plaintiff believes defines that data as proprietary to the Plaintiff. The relevant confidentiality clause of the Audit Agreement provides, in pertinent part:
 "The parties agree that the information provided by TPC as described in this Agreement is considered to be proprietary and confidential. RIAC agrees that the information provided by TPC under this Agreement shall be kept in strict confidence and shall not be distributed or disseminated in whole or in part to any third parties other than members of the RIAC Board and RIAC senior management related to audit and finance and its legal or audit or bond consultants and then only for the purpose of enabling RIAC to reasonably confirm that the gross revenues reported by TPC from the operation of the parking concession and the rent due RIAC under the terms of the Concession Agreement have been correctly calculated. In addition on a confidential basis, RIAC, may share information provided by TPC under this agreement with investment bankers and consultants retained by RIAC in connection with the issuance of revenue bonds to fund projects at T.F. Green Airport. RIAC shall require all persons receiving information under this Agreement to agree to abide by the confidentiality provisions of this Section 2."
Plaintiff insists that this clause unambiguously identifies the parking financial data as the exclusive property of TPC because it describes the data as "confidential and proprietary"; it forecloses free use of the data by the Defendant; and it places no prohibitions on the Plaintiff's use thereof. Therefore, Plaintiff maintains that "[w]ithout a proven trade secret there can be no action for misappropriation, even if defendant's actions were wrongful." Electro-Craft Corp. v. ControlledMotion, Inc., 332 N.W. 2d 890, 897 (Minn. 1983).
The Audit Agreement is limited in scope to data contained in ten specifically defined reports provided by TPC to RIAC. The Court, however, must look to the Counterclaim itself to understand the scope of the data alleged by RIAC to constitute RIAC's trade secret. The Counterclaim refers to the alleged trade secret as "parking financial data," and defines that term in paragraph 45 as "revenue control system data and cost data."
It appears that the data referred to in the Audit Agreement as "proprietary and confidential" may be a more limited subset of the data which the Counterclaim alleges is protected as a trade secret. At any rate, the Court cannot at this stage of the proceedings determine thatall of the data alleged by RIAC to constitute its trade secret is coextensive with specific reports considered "proprietary and confidential" under the Audit Agreement. For that reason alone, the Court is unable to rely exclusively on the Audit Agreement for a determination relative to ownership of the data referred to in the Counterclaim.
In addition, alleged "ownership" of the financial data is not determinative of trade secret protection. The Act defines "trade secret" to include "information" that "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure," so long as the entity claiming the trade secret makes "efforts that are reasonable under the circumstances to maintain its secrecy." G.L. 1956 § 6-41-1. Although the holder of a trade secret may be considered to have acquired a property right therein, seeRuckelshaus v. Monsanto Co., 467 U.S. 986, 1003-04 (1984); see alsoColonial Laundries, Inc. v. Henry, 48 R.I. 332, 337, 138 A. 47, 49
(1927), the Act does not require ownership of the property in order to have trade secret protection thereof. "[T]he inherent nature of trade secret limits the usefulness of an analogy to property in determining the elements of a trade secret misappropriation claim." DTM Research, L.L.C.v. ATT Corp., 245 F.3d 327, 332 (4th Cir. 2001) (holding that fee simple ownership was not necessary to claim trade secret protection pursuant to Maryland's Uniform Trade Secrets Act, which uses language identical to G.L. 1956 § 6-40-1.). "It is the secret aspect of the knowledge that provides value to the person having the knowledge." Id.;see also Colonial Laundries, Inc., 48 R.I. at 337, 138 A. at 49 (even though no actual physical list existed, drivers had a duty to maintain secrecy of former employer's customer names committed to memory). Thus, as the DTM court explained, it is possession, not ownership or title, which is the relevant inquiry. DTM Research, L.L.C., 245 F.3d at 332. A protectable trade secret may arise when one knows of the information sought to be protected, as long as it remains secret. Id. Furthermore, the fact that more than one party "owns" or "possesses" secret information does not negate its classification as a trade secret. Id. at 333; see also Bestechnologies, Inc. v. Trident Envtl. Sys.,681 So. 2d 1175, 1176 (Fla.Dist.Ct.App. 1996) ("the fact that several competitors each independently use a process that each has independently discovered would not necessarily mean this undisclosed information is no longer a trade secret.").
Looking at the facts in the light most favorable to RIAC, this Court must assume for the purposes of this motion that the so-called "parking financial data" is the type of "information" that "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure." § 6-40-1. Additionally, RIAC "possessed" the parking financial data as soon as it was delivered by TPC. Therefore, the data could be the subject of a trade secret misappropriation claim by RIAC, independent of whether TPC could be considered to have owned the data which is the subject matter of the claim.[7] Accordingly, this Court must deny Plaintiff's motion to dismiss Counts I and II of the Counterclaim.
Count III.
Plaintiff has moved to dismiss Count III of the Counterclaim, which count seeks damages for TPC's breach of Paragraph 5 of a mediation agreement between TPC and RIAC. That provision in the mediation agreement provides in pertinent part that the parties are to "`treat the fact that mediation occurred, and all aspects of the mediation, as confidential, and will not disclose the fact of the mediation or anything that occurred during it to anyone not a Party to the mediation other than the Mediator, except as otherwise may be required by law.'" (Counterclaim, paragraph 151 (quoting paragraph 5 of the Mediation Agreement))
Plaintiff admits that in paragraph 44 of the original complaint, TPC referred to a mediation proceeding that took place in April 2004, and that the "mediation failed to achieve a mutually satisfactory resolution of the issues in dispute between the parties." That paragraph of the complaint did not reveal the content of any confidential communications or documents that were the subject matter of the mediation, nor reveal the reason why the mediation was unsuccessful. The reference to the mediation was removed when the Plaintiff filed an Amended Complaint, which it did within several weeks of the filing of the initial pleading. The question raised on the motion to dismiss is whether Count III of the Counterclaim, alleging damages by reason of such a breach, states a viable claim.
Although the revelation in the pleading of the fact that a mediation took place is technically violative of the confidentiality provisions of the mediation agreement, this Court fails to see how such a technical breach constitutes a material breach. A material breach occurs when there is a breach of an essential feature of a contract, and must defeat the parties' object in making it. See generally, 17 Am. Jur. 2d, Contracts, § 706 (2d ed. 2004). Here, the essential thrust of the mediation agreement is to seek alternative dispute resolution, with all parties sharing information candidly with the mediator, without fear that the matters shared with the mediator will later taint judicial proceedings if the mediation is unsuccessful. Although in this instance the parties agreed that even the fact that the mediation took place was to remain confidential, this Court cannot say that such a provision was an essential or vital term of the agreement. In addition, the pleading that mentioned the mediation is no longer operative in these proceedings. SeeCertain Underwriters at Lloyd's v. McDermott Int'l, Inc., 2002 W.L. 22023 (E.D. La. 2002) (disclosure of document subject to confidentiality agreement was not material breach of contract, since confidentiality was not the principal objective of the contract).
Whether a party has materially breached its contractual obligations is usually a question of fact to be decided by a jury. Nat'l Chain Co. v.Campbell, 487 A.2d 132, 135 (R.I. 1985). However, if the issue of materiality admits of only one reasonable answer, then the court should intervene and resolve the matter as a question of law. Women's Dev.Corp. v. City of Central Falls, 764 A.2d 151, 158 (R.I. 2001).
This Court finds it difficult to understand how TPC's revelation of the fact of mediation, but not the substance of the mediation, could result in any damage whatsoever to RIAC. However, contract law provides that even if no actual damage or loss can be proven in connection with a non-material breach, nominal damages may be awarded for such a breach. Restatement (Second) of Contracts § 346; accord Gallagher v. Poignies,79 R.I. 423, 428, 90 A.2d 413, 415 (1952). Accordingly, the Court must deny the motion to dismiss Count III of the Defendant's Counterclaim.
 NEP'S MOTION TO DISMISS THE THIRD PARTY COMPLAINT
NEP moves in accordance with Super. Ct. R. Civ. P. 12 (b)(6), to dismiss the Third Party Complaint in its entirety. Count I of the Third Party Complaint alleges tortious interference with contract, and is predicated on both NEP's use of the so-called "parking financial data" to unfairly compete with RIAC, and on NEP's advertising practices[8] which allegedly diverted customers from RIAC garages to the NEP garage. Counts II and III allege violations of the Rhode Island Trade Secrets Act and are also based on NEP's alleged use of the parking financial data. Counts IV and V allege violation of the Easement Agreement between the parties which prohibits NEP from advertising the "rates" for Garage C on a sign visible from the Airport Circulator.
Count I.
A prima facie case of tortious interference with contract requires the aggrieved party to show "(1) the existence of a contract; (2) the alleged wrongdoers' knowledge of the contract; (3) his [or her] intentional interference; and (4) damages resulting therefrom." Belliveau Bldg.Corp. v. O'Coin, 763 A.2d 622, 627 (R.I. 2000) (quoting Smith Dev. Corp.v. Bilow Enterprises, Inc., 112 R.I. 203, 211, 308 A.2d 477, 482
(1973)). The aggrieved party must show that the alleged tortfeasor acted with "legal malice — an intent to do harm without justification." Id.
(quoting Jolicoeur Furniture Co. v. Baldelli, 653 A.2d 740, 753 (R.I. 1995)). Once the plaintiff alleges and demonstrates that the putative tortfeasor intended to do harm to the contractual relationship without any legally recognized privilege or justification, the burden shifts to the putative tortfeasor to prove that the contractual interference was justified. Id.
RIAC first alleges that NEP intentionally interfered with the CLA by receiving parking financial data from TPC for use in connection with NEP's competing operation. RIAC considers such data to be a trade secret. Use of this data is alleged to have caused TPC to divert cars to the garage operated by NEP that would have otherwise parked in the TPC facilities, in violation of Paragraph G of the Third Amendment to the CLA.[9] NEP contends that it is entitled to judgment as a matter of law as to Count I of the Third Party Complaint because the parking financial data which NEP received from TPC was proprietary to TPC (according to the Audit Agreement) and therefore TPC and NEP have ample justification for sharing the data, thus defeating a claim for tortious interference.
As discussed supra, however, it is far from clear on the face of the pleadings that the term used by the Third Party Plaintiff to describe the information that TPC shared with NEP ("parking financial data") is coextensive with the description of that information considered "proprietary and confidential" as defined in the Audit Agreement.
In addition, courts consider a variety of factors in a determination of whether an alleged interference was legally justified.[10] Such an inquiry is a fact intensive one, not amenable to disposition on the pleadings. See Haley, 611 A.2d at 847. For instance, to the extent that RIAC is able to establish trade secret protections for all or some portion of the "parking financial data," this Court would be overreaching on a 12 (b)(6) motion to determine that the sharing of such data constitutes a justifiable act by TPC as a matter of law. Conversely, it may be that at trial TPC can establish that the relationship of the three parties (NEP, TPC, and RIAC) was such that the sharing of the data was anticipated, expected, or otherwise "justified."
As to advertising by NEP on airport property and on airport shuttle buses, TPC and RIAC have contractual agreements that prohibit TPC from intentionally diverting cars away from certain parking facilities subject to the CLA. It is alleged by RIAC that NEP's advertising of its competing Garage C results in NEP's intentional interference with the CLA between TPC and RIAC. NEP, to the contrary, suggests that it is permitted, and therefore legally justified, to advertise its competing facility (with one exception that will be discussed infra), and as such is entitled to judgment as a matter of law on this aspect of RIAC's tortious interference claim. Once RIAC granted an easement to facilitate access to Garage C from airport property, it would seem perhaps illogical, at first blush, to expect that NEP might not vigorously advertise its competing garage without fear that in so doing it might be liable for tortious interference. However, the Court further observes that Paragraph G of the Third Amendment to the CLA, prohibiting TPC from diverting cars from certain parking areas controlled under the CLA, appears to have been executed on the same day as the Easement Agreement.
Since the elements of "legal justification" that might be dispositive of a contractual interference claim are highly fact based, this Court cannot say "beyond a reasonable doubt" at this juncture that RIAC, as third party plaintiff, "would not be entitled to relief under any set of conceivable facts." Toste Farm Corp. v. Hadbury, Inc. 798 A.2d 901, 905
(R.I. 2002). Accordingly, NEP's motion to dismiss Count I of the Third Party Complaint must be denied.
Counts II and III.
Counts II and III of the Third Party Complaint seek relief under the Rhode Island Trade Secrets Act. RIAC alleges that NEP misappropriated the trade secrets of RIAC by receiving and using the parking financial data shared with it by TPC. Employing the same analysis as TPC, NEP argues that the data is proprietary to TPC under the Audit Agreement, and therefore cannot constitute a trade secret as a matter of law. This Court's analysis as to the Plaintiff's motion to dismiss the trade secret Counterclaim applies with equal force here. Based on that analysis, the Court cannot conclude that the Audit Agreement is dispositive of the determination of whether the parking financial data described in the Third Party Complaint may be subject to trade secret protection. Accordingly, the 12 (b)(6) motion addressed to these two counts must be denied.[11]
 Counts IV and V.
The final two counts of the Third Party Complaint allege that NEP violated an express term of the Easement Agreement. Section 17 thereof provides that "NEP shall not erect any sign on or near the NEP garage that would be visible from the Airport Circulator that advertises the rates for the NEP garage." It is uncontroverted that NEP displayed an advertising banner on Garage C declaring "Lowest Parking Rates" and "Lowest Rates." NEP argues that these counts fail to state a claim as a matter of law because the banners do not violate the express language of the Agreement.
It is well established that when interpreting the meaning of a contract, courts give terms their "plain, ordinary and usual meaning."W.P. Assoc. v. Forster, Inc., 637 A.2d 353, 356 (R.I. 1994). "`On the other hand, the situation of the parties and the circumstances attending the speaking of the words used in a contract also are relevant to a determination of their intended meaning.'" The Ret. Brd. of theEmployees' Ret. System of the State of Rhode Island v. DiPrete,845 A.2d 270, 283 (R.I. 2004) (quoting Westinghouse Broadcasting Co. v.Dial Media, Inc., 122 R.I. 571, 581, 410 A.2d 986, 992 (1980)). The dictionary definition of the term "advertising" is "[t]he action of drawing the public's attention to something to promote its sale," Black'sLaw Dictionary 55 (7th ed. 1999), while that of the term "rate" is "an amount paid or charged for a good or service." Id. at 1268.
The Court could only dismiss Counts IV and V of the Third Party Claim if, as a matter of law, the Court were to find that the declaration of "lowest rates" was not violative of the contract language prohibiting certain advertisement of "rates for the NEP garage." This would require a finding that the express contract language unambiguously comprehended only a prohibition of an actual dollar figure to be a violation of the clause. However, considering merely the dictionary definitions of the terms used, the banner declaring "lowest rates" clearly appears to "draw the attention of the public" to the "amount . . . charged" by NEP at Garage C, without stating the actual dollar amount. Therefore, without an understanding of the circumstances surrounding the choice of the words, tending to suggest a more precise definition of the term "rate", this Court cannot, as a matter of law, declare that it was not a violation of the contract prohibition. Accordingly, the Court must deny the motion to dismiss Counts IV and V of the Third Party Complaint.
 RIAC'S MOTION FOR JUDGMENT ON THE PLEADINGS
The Defendant moves for judgment on the pleadings with regard to Counts I and II of the Plaintiff's Amended Complaint. Count I seeks a declaration by the Court that the CLA is terminated as a result of the enumerated alleged material breaches committed by the Defendant, and that all future obligations of the Plaintiff are thereby discharged.
Count II of the Amended Complaint seeks damages for breach of contract. RIAC moves for judgment on this count based on the assertion that the alleged breaches flow from the condemnation of Garage B and, as such, are duplicative of the claims and rights of the parties pending in a related condemnation action in Kent County Superior Court.[12]
Standard of Review.
"A rule 12 (c) motion is tantamount to a Rule 12 (b)(6) motion, and the same test is applicable to both, that is, is it clearly apparent that the plaintiff can prove no set of facts to support the complaint." Collins v.Fairways Condo. Ass'n, 592 A.2d 147, 148 (R.I. 1991). "The factual allegations contained in the nonmovant's pleadings are admitted as true for the purposes of the motion" and "[a]ll proper inferences to be derived from the pleadings are to be drawn in favor of the nonmovant."Haley, 611 A.2d at 847. "The standard for prevailing on a 12 (c) motion is an especially difficult one to meet when the questions of law applicable to the controversy are fact intensive." Id.
 Count I.
Defendant moves to dismiss Count I of Plaintiff's Amended Complaint based on the assertion that the CLA unambiguously forecloses TPC's right to terminate. Article XXVI(A) of the CLA provides that "[e]xcept for those provisions of the Agreement specifically allowing termination, neither party shall have the right to terminate this Agreement because of breach or default of the other party." While Article XXIV identifies specific circumstances under which RIAC[13] may terminate the contract, the CLA does not identify any situations in which TPC may do so. Rather, Article XXV provides that the sole remedy available to TPC, should RIAC breach, is to seek mediation or arbitration. Additionally, the CLA allows for termination by an arbitrator, but only "if no remedy exists to allow continuation of the Agreement." (CLA, Article XXVI (C)). Finally, Article XXIV (A) provides that "[t]his agreement may only be terminated (i) by order of an arbitrator pursuant to arbitration proceedings in accordance with Article XXVI hereof, subject to any right of appeal, or (ii) by [RIAC] pursuant to Article XXIV (C) hereof."
In the absence of a specific agreement to the contrary, "[a] party's material breach of contract justifies the nonbreaching parties' subsequent nonperformance of its contractual obligations." Women's Dev.Corp., 764 A.2d at 158. Plaintiff argues that by reason of certain breaches of the CLA which Plaintiff characterizes as "material," Plaintiff is entitled to terminate the CLA and be relieved of any further obligations thereunder. Count I of the Amended Complaint sets forth the alleged material breaches which form the basis of such a common law right of rescission. Since normally the determination of the materiality of a breach is left to the trier of fact, see Nat'l Chain Co., 487 A.2d at 135
(R.I. 1985), Plaintiff suggests that the Defendant's motion to dismiss such claim as a matter of law must fail.
Parties to a contract, however, may explicitly agree to limit the remedies available to the parties in the event of a breach. See SchminkeMilling Co. v. Diamond Bros., 99 F.2d 467, 473 (8th Cir. 1938); McGeeConstr. Co. v. Neshobe Dev., 594 A.2d 415, 418 (Vt. 1991). See generally
7 Richard A. Lord, Williston on Contracts, § 15:12 (4th ed. 2002); E.H. Schopler, Annotation, Comment Note. — Contractual Provisions as toRemedy as Excluding Other Possible Remedies, 84 A.L.R. 2d 322 (1962). If the parties have made a clear and unambiguous agreement to limit remedies for breach to those specifically set forth in the contract, the court should enforce such an unambiguous agreement, even if doing so results in varying the law that might pertain in the absence of such an explicit agreement. See Scullian v. Petrucci, 108 R.I. 406, 409, 276 A.2d 277, 279
(1971).
The Plaintiff relies heavily on the case of Olin Corporation v. CentralIndustries, Inc., 576 F.2d 642 (5th Cir. 1978), in its objection to the motion. In Olin the court adopted the so-called "Williston Rule," which provides that unless a contract provision for termination for breach is by its terms exclusive, the contractual termination provisions are cumulative to those that exist at common law, including the right to be excused from performance if the defaulting party commits a material breach. Olin Corp., 576 F.2d at 647-48.[14]
Articles XXIV(A) and XXVI (A) of the CLA express the clear and unambiguous intent of the parties that they are limited to certain termination rights set forth in the agreement.[15] This Court, therefore, is obligated to enforce such limitations. Since the parties' agreements do not permit TPC to seek a judicial remedy of rescission terminating the agreement, even if RIAC committed a material breach, the Court is constrained to grant Defendant's motion to dismiss Count I of the Amended Complaint.[16]
 Count II.
Defendant moves for judgment on the pleadings as to Count II of the Amended Complaint based on the assertion that Plaintiff's claim is redundant of the damages available in the Kent County condemnation proceeding. The issue is whether the damages for the various alleged contract breaches set forth in this claim are duplicative of the damages available in the condemnation action. Count II seeks damages for breach of contract, including alleged breaches of the covenant of quiet enjoyment, the exclusive parking concession, the agreement not to operate a new parking facility on the subject property, the covenant on parking rates, and the agreement to abide by the dispute resolution process.
The EDC, which is not a party to this action, has condemnation power to acquire "any real property, . . . whether a fee simple absolute or a lesser interest" by exercising the right of eminent domain. G.L. 1956 §42-64-9 (a) and (b). Owners and persons entitled to any rights in the "real property taken" are entitled to just compensation, and must petition the Superior Court in which the "real property is situated" for damages. Id. § 42-64-9(j). "It is well established that in a condemnation proceeding a property owner is entitled to just compensation for the fair market value of the property as of the date of the taking." Gorham v.Pub. Bld. Auth. of the City of Providence, 612 A.2d 708, 712 (R.I. 1992); see also Mastrobuono v. The Providence Redev. Agency of the Cityof Providence, 850 A.2d 944, 947 (R.I. 2004). However, "not all losses suffered by the owner are compensable" and "[i]n the absence of a statutory mandate, the sovereign must pay only for what it takes, not for opportunities which the owner may lose." United States Ex Rel. TennesseeValley Auth. v. Powelson, 319 U.S. 266, 281-82 (1943).
As the Supreme Court further noted, considerations of consequential damages for loss of a business or its destruction may not be compensable in a condemnation. Id. at 282-83. Futhermore, the Rhode Island Supreme Court has held that the property owner must sue the condemning authority, not the current owner of the condemned property, for damages resulting from the condemnation. Root v. Providence Water Supply Brd.,850 A.2d 94, 100 (R.I. 2004). Accordingly, it is the EDC, not this defendant, which is solely responsible for any condemnation award.
By statute, the Kent County proceeding seeks an assessment only of TPC's real property interest in a temporary easement in Garage B at the time of the taking. The EDC is obligated to compensate TPC in accordance with that court's determination of "just compensation." Even putting aside the question of the proper party for the condemnation award, this Court cannot say with assurance that the damages recoverable in the Kent County action will, as a matter of law, duplicate the damages potentially recoverable for the various breaches for which TPC seeks recovery in Count II herein.
For instance, TPC alleges in Count II of the Amended Complaint herein that it is entitled to damages for the loss of the exclusive parking operations in other garages and lots subject to the CLA as a result of RIAC's competing parking operation in the condemned easement at Garage B. In addition, a portion of Count II seeks damages resulting from RIAC's alleged unilateral lowering of parking rates. On the face of the complaint, therefore, it appears that TPC is seeking to establish loss beyond that which would be the subject of compensation in the condemnation action which is limited to the value of the loss of a temporary easement in Garage B. The Court is mindful of the position taken by RIAC that to the extent that ultimately some, or even all, of the damages attributable to the Count II breaches will be compensated through the condemnation action, this Court can invoke normal jurisprudential rules to prevent an injured party from duplicate recoveries. See Kattar v. Demoulas, 739 N.E. 2d 246, 258 (Mass. 2000);see also Graff v. Motta, 695 A. 2d 486, 492 (R.I. 1997). See generally 24 Richard A. Lord, Williston on Contracts, § 64:1 at 4-5 (4th ed. 2002) (discussing the fundamental principle of damages). However, the Court is unable, at this stage, to leap to the conclusion that every element of Plaintiff's claims set forth in Count II herein will be redundant of the compensation awardable in the Kent County proceedings. Accordingly, the motion for judgment on the pleadings as to Count II of the Amended Complaint is denied.
 CONCLUSION
For the foregoing reasons, Plaintiff's and Third Party Defendant's motions to dismiss are denied. Defendant's motion for judgment on the pleadings is granted as to Count I of the Amended Complaint, and denied as to Count II. Counsel shall submit an order consistent with this decision.
[1] The CLA, dated December 8, 1986, was entered into between Rhode Island Department of Transportation (RIDOT) and Downing Parking Associates, L.P.(Downing). In 1993 RIDOT assigned its interest in the agreement to the Defendant, RIAC, and in 1995, a group of investors purchased Downing and renamed it TPC.
[2] Since these motions address the viability of claims by way of either Rule 12 (b)(6) or Rule 12 (c), the facts must be viewed in the light most favorable to the non-moving party. Haley v. Town of Lincoln,611 A.2d 845, 847,850 (R.I. 1992).
[3] NEP is the General Partner of TPC.
[4] The EDC was the actual condemning authority. The EDC exercised its power of condemnation to acquire a Temporary Easement in Garage B, the duration of which runs from July 28, 2004 through November 29, 2007. EDC then assigned the condemned interest to RIAC. The condemnation proceeding was commenced in Kent County Superior Court. See Condemnation Order,Rhode Island Economic Development Corporation v. The Parking Co., MP 2004-665 (June 28, 2004) (attached to Plaintiff's Amended Complaint as Exhibit Y).
[5] The Uniform Trade Secrets Act, codified in G.L. 1956 § 6-41-1 et seq., provides the following pertinent definitions:
 "(1) "Improper means" includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means;
(2) "Misappropriation" means:
 (i) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
 (ii) Disclosure or use of a trade secret of another
without express or implied consent by a person who:
 (A) Used improper means to acquire knowledge of the trade secret; or
 (B) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was:
 (I) Derived from or through a person who had utilized improper means to acquire it;
 (II) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
 (III) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; . . .
 (4) "Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process, that:
 (i) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
 (ii) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." (emphasis added).
[6] Defendant suggests that Plaintiff's reliance on the Audit Agreement necessitates converting this motion into one for summary judgment under Rule 56. However, the Plaintiff attached to the Amended Complaint and incorporated therein by reference the CLA, as amended, including the Audit Agreement. As a general rule, "a motion justice may properly consider and refer to such documents in deciding a Rule 12 (b) (6) motion." Bowen Ct. Assoc. v. Ernst Young, LLP, 818 A.2d 721, 725-26
(R.I. 2003); see Super. R. Civ. P. 10 (c) ("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes."). Defendant notes that neither the CLA nor the Audit Agreement was a part of the particular pleading that Plaintiff moves to dismiss. The policy behind Rule 10 (c) is that review of and reliance on such documents on a motion to dismiss is permissible because their inclusion in the pleadings affords the opposing party notice and an opportunity to respond. See Cortec Inds., Inc. v. Sum Holding L.P., 949 F.2d 42, 48 (2d Cir. 1991) (discussing the corresponding Federal rule). Attachment of the Audit Agreement to the Plaintiff's Amended Complaint clearly afforded Defendant the requisite notice and opportunity and, in fact, the Defendant referred to the Audit Agreement in the Counterclaim, citing to the Plaintiff's attached exhibits.
[7] At this stage of the proceedings, the Court cannot, and should not, determine if RIAC will be able to meet its burden of establishing the facts necessary to make out a trade secrets claim. See Bragg,102 R.I. at 12, 227 A.2d at 584.
[8] Specifically, Count I refers to advertising on airport property and in TPC shuttle buses.
[9] That paragraph provides as follows: "TPC shall not intentionally divert cars from the New Parking Facilities that would have otherwise parked in the New Parking Facilities to a TPC parking facility on or near the Airport or a parking facility on or near the Airport owned by a related party or affiliate of NEP."
[10] "[T]he Restatement provides seven factors that a court should weigh in determining whether an act of interference was `improper,' or unjustified: (1) the nature of the actor's conduct; (2) the actor's motive; (3) the contractual interests with which the conduct interferes; (4) the interests sought to be advanced by the actor; (5) the balance of social interests in protecting freedom of action of the actor and contractual freedom of the putative plaintiff; (6) the proximity of the actor's conduct to the interference complained of; and (7) the parties' relationship." Belliveau Bldg. Corp., 763 A.2d at 629 (citing Restatement (Second) Torts § 767 at 26-27 (1979)).
[11] NEP argues that a stray reference in Paragraph 115 of the Third Party Complaint somehow constitutes an admission by RIAC that the parking financial data is not a trade secret as defined in § 6-41-1. The Court, however, gives no weight to what appears to be a misplaced clause inserted by typographical error.
[12] Pursuant to statute, TPC is pursuing its claims against the EDC in Kent County Superior Court for an assessment of damages. See The ParkingCo., L.P. v. Rhode Island Economic Development Corporation,
KM-2004-905.
[13] The CLA refers to RIAC's predecessor as the "Department."
[14] In addition, Plaintiff cites Jakober v. E.M. Loew's CapitalTheatre, Inc., 107 R.I. 104, 265 A.2d 429 (1970) for the proposition that "contractual provisions limiting the parties' power to terminate the contract are ineffective when a party has committed a material breach." (Plaintiff's Objection at 8) Jakober, however, reflects the Court's discussion of the law of abandonment as it relates to a contract for the sale of real estate. Jakober lends no support for the proposition for which it has been cited.
[15] The Defendant attempts to educate the Court as to the intent of the parties in including such limitation on the rights of TPC to terminate. (See Defendant's Brief at 3-5) However, such analysis falls outside the purview of the Court's legitimate inquiry on a 12(c) motion.
[16] In light of this disposition, the Court need not stray outside the pleadings to determine if summary judgment would be appropriate as to the issue of the materiality of the breaches alleged.