DECISION
Before this Court is a Super. R. Civ. P. 56 motion for summary judgment brought by Steven Colagiovanni, M.D. (Colagiovanni), Eric Olsson, M.D. (Olsson), and Consultants in Urology, Inc. (CIU) (collectively, Physician Defendants). The Physician Defendants claim they are entitled to summary judgment as to Counts I, II, IV-VII, and IX of Plaintiff Bay Area Mobile Medical, LLC's (Plaintiff or BAMM) Second Amended Complaint (Complaint) because there is no evidence that the Physician Defendants (1) disclosed BAMM's confidential information; (2) improperly interfered with BAMM's contract with St. Joseph Health Services of Rhode Island; or (3) entered into an agreement with St. Joseph to accomplish the alleged conspiracy. Additionally, St. Joseph Health Services of Rhode Island joins the Physician Defendants in their motion as to Count IX of the Complaint alleging civil conspiracy.
 I Facts and Travel
Colagiovanni and Olsson are medical doctors specializing in the practice of urology. See Colagiovanni Aff. ¶ 2; Olsson Aff. ¶ 2. Our Lady of Fatima Hospital, a surgical hospital under the structure of St. Joseph (St. Joseph), was among the places Colagiovanni and Olsson treated *Page 2 
patients. See Colagiovanni Aff. ¶¶ 3, 5; Olsson Aff. ¶ 5. CIU is a general urology practice group founded in 2000 by Colagiovanni, for which he serves as President and Chief Executive Officer.[1]
(Colagiovanni Aff. ¶ 4.) As part of their practice, the Physician Defendants prescribe and perform lithotripsy[2]
treatments at St. Joseph. (Colagiovanni Aff. ¶ 5; Olsson Aff. ¶ 5.)
BAMM was formed in 2000 to provide health care facilities with the equipment necessary to perform extracorporeal shock wave lithotripsy services. See Mercurio Aff. ¶ 3. In 2001, BAMM entered into a contract (BAMM Agreement) with St. Joseph to become its exclusive provider of lithotripsy services.[3] Id. ¶ 5.
According to Colagiovanni, BAMM proceeded to meet with the urologists who had privileges at St. Joseph, including Colagiovanni and Dr. Joseph Cambio (Cambio), [4] the Chief of Urology, to offer them the opportunity to purchase membership units in BAMM.[5]
(Colagiovanni Dep. 5:5-25, Sept. 28, 2010.) Despite his initial interest, Cambio decided his practice would not invest in BAMM at that time. Id.
In 2001, following Colagiovanni's departure from the practice, Cambio's urological practice purchased a membership interest in BAMM. (Mercurio Aff. ¶ 7.) That unit was later transferred, with the approval of BAMM's Board of Managers, to an entity known as Quaker *Page 3 
Lane Investors.[6] Id. In or about 2005, Quaker Lane Investors' membership unit was converted into individual units for Cambio and the other urologists in his practice.Id. ¶ 8. As part of the conversion, Cambio and his associates were each required to pay an additional $10,000 per membership unit to ensure that each paid fair market value. Id. ¶ 9.
In or about December 2005, St. Joseph and BAMM negotiated an extension of the original BAMM Agreement. (Mercurio Aff. ¶ 10.) Although a three-year term was initially discussed, the extension agreement (Extension Agreement) executed on December 23, 2005, consisted of a fifteen month base term with automatic rollovers, unless terminated for cause.[7]Id.; Pl.'s Opp'n Br. Ex. C.
According to Plaintiff, in or about June 2006, Colagiovanni received a phone message from John Fogarty (Fogarty), St. Joseph's Executive Vice President and Chief Operating Officer, informing him that BAMM's contract with St. Joseph was to expire on December 31, 2006.[8] See Pl.'s Opp'n Br. Ex. D. Additionally, in June 2006 BAMM alleges that Colagiovanni had discussions with and received phone messages from employees of Ocean Lithotripsy and Counter Pulsations. Id.; Colagiovanni Dep. 10:3-14, 13:10-14:1-20, Sept. 28, 2010.
BAMM alleges that during the summer and fall of 2006, Colagiovanni, Olsson, and Dr. Vincent J. Zizza III (Zizza) contacted Gregory A. Mercurio, Jr. (Mercurio), its Director of *Page 4 
Administration and Business Development, regarding the possibility of investing in and becoming members. (Colagiovanni Aff. ¶ 7; Mercurio Aff. ¶ 11; Mercurio Dep. 84:8-93:7, Apr. 29, 2010.) On August 1, 2006, Olsson and Colagiovanni executed a confidentiality agreement (Confidentiality Agreement)[9] with BAMM, and Mercurio subsequently forwarded them confidential information (Confidential Information)[10] pursuant to its terms.See Pl.'s Opp'n Br. Ex. F ¶ 1; Colagiovanni Aff. ¶ 7-8; Mercurio Aff. ¶ 12-13. However, by October 2006, negotiations came to an impasse.[11] (Colagiovanni Dep. 32:5-14, Sept. 28, 2010.) *Page 5 
According to BAMM, in September or October 2006, Harold Breinig (Breinig), director of lithotripsy sales and services for Vantage Mobile Services Ltd. (Vantage)[12] began discussions with Andrew Stinton (Stinton), the procurement manager and director of material services at St. Joseph.[13]
(Stinton Dep. 97:12-21, 102:19-103:2, Aug. 22, 2010.) On October 16, 2006, Stinton and Breinig held a meeting in which they discussed the services that Vantage could provide, the pricing that would get St. Joseph interested, and the physicians who would be involved in the process. See Stinton Dep. 105:5-108:24, Aug. 22, 2007; Pl.'s Opp'n Br. Ex. G. Following the meeting, Vantage provided St. Joseph with a proposal which included pricing for the equipment and an outline of how Vantage could help St. Joseph maintain and grow its business. See
Pl.'s Opp'n Br. Ex. G.
St. Joseph's in-house communications indicate that these materials were subsequently forwarded to and reviewed by St. Joseph staff during the first week of November 2006. See Opp'n Br. Ex. H; Stinton Dep. 113:10-115:12, Aug. 22, 2007. Although Vantage's proposal appeared to be more expensive than the current agreement, Stinton contacted Breinig to ensure *Page 6 
that St. Joseph had correctly interpreted Vantage's proposal.Id. Following this conversation, Stinton confirmed Vantage's flat fee rate of $4200 per day for four or more patients.[14]Id.
On November 21, 2006, Vantage delivered a Memorandum of Agreement (MOA) to Colagiovanni. See Pl.'s Opp'n Br. Ex. J. The MOA outlined the potential terms and requirements of a partnership agreement with Vantage. In particular, the MOA provided that the membership shares would be offered at "a cost of $10,000 per share" but that the "offering of investments shares shall be [] dependent on [Vantage] securing an agreement to provide [lithotripsy services] to [St. Joseph]."[15] Id.
On December 1, 2006, Breinig contacted Colagiovanni to set-up a meeting and speak with him about a demonstration of the mobile lithotripsy machine for St. Joseph.[16] See Pl.'s Opp'n Br. Ex. K. On December 8, 2006, in response to Stinton's note about the additional extension of the BAMM Agreement, Fogarty ordered a re-evaluation and competitive re-bid for St. Joseph's lithotripsy services. See Pl.'s Opp'n Br. Ex. M. According to Fogarty, the re-bid process was to be "led by purchasing [with the] involvement of nursing leaders [and] certainly input from urologists."Id. Fogarty also acknowledged that "the BAMM contract goes month to *Page 7 
month after [December 31st,]" giving St. Joseph "plenty of flexibility if [they] decide[d] to switch vendors."[17]Id.
On December 15, 2006, Vantage countersigned the MOA. See
Pl.'s Opp'n Br. Exs. J P. On that same day, Bill Henwood, Vantage's Vice President, contacted CIU and Colagiovanni about the demonstration day that had been scheduled for early January[18]
and about setting a time to speak with him about the partnership between Vantage and the Physician Defendants. See Pl.'s Opp'n Br. Ex. P.
On January 10, 2007, a meeting — attended by Vantage, a number of doctors including Colagiovanni, and possibly hospital personnel — was held to discuss the potential partnership with Vantage. See Colagiovanni Dep. 49:13-51:2, Sept. 28, 2010; Pl.'s Opp'n Br. Ex. P. As a result of the meeting, and at Breinig's direction, a draft of the Lithotripsy Service Agreement between St. Joseph and Vantage was forwarded to Stinton for his review.See Pl.'s Opp'n Br. Ex. Q.
As a result of Vantage's failure to secure proper licensing and certification, the Rhode Island Department of Health (RIDOH) cancelled Vantage's in-house trial. (Squillante Dep. 11:17-12:11, Sept. 1, 2010.) According to Mercurio, RIDOH contacted BAMM, informing them *Page 8 
that a new lithotripter had been brought into St. Joseph and alerting them of Vantage's negotiations with St. Joseph.[19]
(Mercurio Dep. 158:21-164:3, Apr. 29, 2010.)
On January 15, 2007, Stinton informed Breinig that there were a number of follow-up issues that needed to be resolved, but directed him to develop a contract that was acceptable to both St. Joseph and Vantage.[20] See Pl.'s Opp'n Br. Ex. U. Correspondence between St. Joseph and Vantage indicates that although St. Joseph appeared willing to move forward with the Vantage contract, Vantage was hesitant to interfere with St. Joseph's current agreement with BAMM. See Pl.'s Opp'n Br. Ex. E. Specifically, on January 15, 2007, Henwood emailed Stinton informing him that in light of "the developments from last week . . . Vantage's position is to respect all contracts and not to have any affect on Hospital-Vendor relations. Should the Hospital have the ability and decide to sever its contractual relationship with the current vendor, we will be ready to be of service." Id. Additionally, Henwood emailed Colagiovanni to "schedule [a] time to speak with [him] about the path forward for ESWL through Vantage."[21]See Pl.'s Opp'n Br. Ex. V. *Page 9 
Despite, Vantage's hesitations, on January 16, 2007, Fogarty instructed Squillante to arrange an offsite trial of Vantage's equipment for Colagiovanni, Olson, and Zizza.[22] See Pl.'s Opp'n Br. Ex. X. On January 22, 2007, Fogarty sent an email to Stinton updating him on the regulatory issues related to the Vantage contract. See Pl.'s Opp'n Br. Ex. Y. Several days later, Breinig emailed Colagiovanni to update him on the status of the "Lithotripsy project" at St. Joseph and to arrange a meeting for Colagiovanni and his associates with Allonge and Henwood.See Pl.'s Opp'n Br. Ex. Z.
As contract negotiations between St. Joseph and Vantage progressed, Vantage made several "unusual" requests. First, Vantage sought an indemnity from St. Joseph from any potential litigation stemming from BAMM's termination. See Pl.'s Opp'n Br. Ex. BB. In fact, Breinig emailed Colagiovanni on February 13, 2007, informing him that the contract would be ready to be signed "as soon as the hospital signs off on the letter exempting Vantage from any trouble from their current vendor."Id. Breinig also reiterated that Vantage would be willing to offer Colagiovanni the partnership after the indemnity and contract were finalized.[23] Id.
Although Fogarty initially expressed concerns about indemnifying Vantage, [24] on February 14, 2007, he executed the indemnity.See Pl.'s Opp'n Br. Ex. CC. Under its terms, *Page 10 
Vantage would be indemnified "from any and all legal action brought against [St. Joseph] as a result of termination of the existing vendor's service contract."[25] Id.
Despite these requests, the final Lithotripsy Service Agreement was executed by St. Joseph on March 9, 2007, and BAMM was subsequently terminated on March 15, 2007.[26] At a May 10, 2007 meeting of the Board, H. John Keimig, St. Joseph's Chief Executive Officer, informed the Board that Vantage's selection was "done under prudent business practice, resulting in operational savings to the Hospital." (Pl.'s Opp'n Br. Ex. EE.)
 II Standard of Review
Summary judgment is proper when, after reviewing the admissible evidence in the light most favorable to the non-moving party, "no genuine issue of material fact is evident from the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, and the motion justice finds that the moving party is entitled to prevail as a matter of law."Smiler v. Napolitano, 911 A.2d 1035, 1038 (R.I. 2006) (quoting Rule 56(c)). When considering a motion for summary judgment, "the court may not pass on the weight or credibility of the evidence but must consider the affidavits and other pleadings in a light most favorable to the party opposing the motion."Westinghouse Broad. Co., Inc. v. Dial Media, Inc., *Page 11 122 R.I. 571, 579, 410 A.2d 986, 990 (R.I. 1980) (internal citations omitted). During a summary judgment proceeding, "the justice's only function is to determine whether there are any issues involving material facts." Steinberg v. State,427 A.2d 338, 340 (R.I. 1981). "Therefore, summary judgment should enter `against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case. . . .'" Lavoie v. North East Knitting, Inc.,918 A.2d 225, 228 (R.I. 2007) (quotingCelotex Corp. v. Catrett,477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986) (construing the substantially similar federal rule)). `[C]omplete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.' Id.
(quoting Celotex, 477 U.S. at 323, 106 S. Ct. at 2552).
 III Discussion A Breach of Confidentiality Agreement Claims: Counts I,II VI
Counts I, II, and VI (Breach Claims) of Plaintiff's Complaint[27] all rely on the alleged disclosure of the Confidential Information and the resulting breach of the Confidentiality Agreement and UTSA by the Physician Defendants. The gravamen of Plaintiff's claims is that *Page 12 
after the Physician Defendants entered into the Confidentiality Agreement with BAMM and were provided with the Confidential Information, they breached the Confidentiality Agreement by disclosing the Confidential Information to Vantage in order to assist Vantage in securing a contract with St. Joseph. See
Pl.'s Opp'n Br. 32-33. In moving for summary judgment, the Physician Defendants contend that there is insufficient evidence from which a trier of fact could infer that they actually disclosed BAMM's Confidential Information. See Defs.' Summ. J. Br. 8. As a result, the Physician Defendants argue that (1) BAMM is not entitled to a declaratory judgment or injunctive relief, (2) BAMM failed to establish a breach of contract or a violation of the Uniform Trade Secrets Act, and (3) the Court should grant summary judgment as to the Breach Claims. Id.
In order to establish a breach of contract claim, a party must provide evidence that there has been a "violation of a contractual obligation, either by failing to perform one's promise or by interfering with another party's performance." Demicco v. MedicalAssocs. of R.I., Inc., No. 99-251L,2000 WL 1146532, *2 (D.R.I. 2000). Moreover, to establish a violation of the UTSA, a claimant must provide evidence of a "[d]isclosure or use of a trade secret of another without express or implied consent . . ."[28] Sec. 6-41-1(2)(ii). *Page 13 
However, to be credible and reliable, evidence need not be direct.Michalic v. Cleveland Tankers, Inc.,364 U.S. 325, 330, 81 S. Ct. 6, 11 (1960) (stating that direct evidence of a fact is not required because circumstantial evidence is not only sufficient, but may also be more certain, satisfying, and persuasive than direct evidence). Our Supreme Court has stated that a plaintiff's burden in a civil case may be supported by circumstantial evidence when no direct evidence on a particular issue is available. See Narragansett Elec. Co. v.Carbone, 898 A.2d 87, 99-100 (R.I. 2006) (citing Harriss v.Orr, 65 R.I. 369, 379-80, 14 A.2d 674, 679 (1940)). It is well settled that there is no difference in the probative value of direct evidence and circumstantial evidence. State v. Hornoff,760 A.2d 927, 931 (R.I. 2000); State v. Caruolo,524 A.2d 575, 582 (R.I. 1987) (stating that circumstantial and direct evidence are equally probative); State v. Webb,75 Conn. App. 447, 451, 817 A.2d 122, 127 (Conn. App. Ct. 2003) (stating that "[i]t is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence"). Although mere conjecture or speculation over the evidence will not rise to a triable issue of fact, `circumstantial evidence, if it meets all the other criteria of admissibility, is just as appropriate as direct evidence and is entitled to be given whatever weight the [factfinder] deems it should be given under the circumstances.'S.E.C. v. Sargent, 229 F.3d 68, 75 (1st Cir. 2000) (quotingUnited States v. Gamache, 156 F.3d 1, 8 (1st Cir. 1998)).
Moreover, if a primary inference is the only reasonable one that may be drawn from an established fact, a secondary inference may be drawn from it. In re Derek,448 A.2d 765, 768 (R.I. 1982); Waldman v. Shipyard Marina,Inc., 102 R.I. 366, 373-74, 230 A.2d 841, 845 (1967). However, the "pyramiding" or stacking of inferences lacks probative force, and will be deemed conjecture or surmise, when the fact from which the primary inference is drawn is susceptible to other reasonable inferences. Id. *Page 14 
Considering the evidence as a whole and in a light most favorable to the Plaintiff, this Court finds that sufficient evidence exists from which a trier of fact could infer that the Physician Defendants disclosed the Confidential Information. Despite Mercurio's concession in his Super. R. Civ. P. 30(b)(6) deposition that neither he nor BAMM had direct knowledge that the Physician Defendants disclosed the Confidential Information to Vantage, a review "of the pleadings, affidavits, admissions, answers to interrogatories and other similar matters," viewed in the proper light, reveals that BAMM's Breach Claims are not ripe for summary judgment.See Industrial Nat'l Bank v. Peloso,397 A.2d 1312, 1313 (1979) Although BAMM lacks direct evidence or knowledge of the alleged disclosure, BAMM has proffered sufficient circumstantial evidence from which to find a genuine triable issue of fact. State v. Diaz, 654 A.2d 1195, 1202 (R.I. 1995) (noting that a process of logical deduction through a series of inferences from established circumstantial facts may be probative);Caruolo, 524 A.2d at 582 (noting that rather than relying on an ambiguous circumstantial fact, guilt may be established from a pattern of corroborating circumstances).
Here, Plaintiff's affidavits indicate that Colagiovanni not only threatened to disclose BAMM's Confidential Information to competitors if BAMM failed to provide the Physician Defendants with membership units in accordance with the "original offering" terms, but Colagiovanni and Olsson also made statements that they "did not want to make more money for BAMM," that the BAMM contract had "been taken care of," and that BAMM was finished at St. Joseph. See Mercurio Aff. ¶ 14; McShane Aff. ¶¶ 3, 5, 8. Further, Plaintiff's evidence indicates that following the breakdown in negotiations with BAMM, the Physician Defendants began negotiating a similar partnership with Vantage — an out-of-state competitor — which was memorialized in the MOA. See Pl.'s Opp'n Br. Ex. J. *Page 15 
Not only were the terms of the MOA identical to those sought from BAMM, but the Physician Defendant's financial interest in Vantage was also "dependent on Vantage securing an agreement to provide [lithotripsy services] to [St. Joseph]." Id. Moreover, Plaintiff's evidence indicates that Vantage's proposal was nearly identical to BAMM's pricing, and that the MOA was executed concurrently with the scheduling of Vantage's equipment trial and the intensification of negotiations between St. Joseph and Vantage.See Pl.'s Opp'n Br. Exs. J, K, P Q; Colagiovanni Dep. 49:13-51:2, Sept. 28, 2010; Mercurio Aff. ¶ 15.
In light of the Physician Defendants' threats and statements, their motivations to ensure that the Vantage deal succeeded, the nature of the materials disclosed to them, the fact that Vantage's proposal was nearly identical to BAMM's pricing, and the likelihood of an outside vendor compiling such a comprehensive and competitive proposal in such a short amount of time, the Court finds that a genuine issue of fact remains as to whether the Physician Defendants disclosed Confidential Information. See State v.Mercado, 635 A.2d 260, 265 n. 4 (stating that a pattern of corroborating evidence or "a mosaic of circumstantial evidence is sufficient" to meet a party's burden of proof). Looking at the evidence proffered by both parties, and the inferences reasonably to be drawn therefrom in a light most favorable to the Plaintiff, the Court finds that when taken as a whole, BAMM has sustained its burden and shown that an issue of fact remains as to the alleged disclosure. As a result, the Court denies the Physician Defendants' request for summary judgment as to the Breach Claims. *Page 16 
 B Tortious Interference Claims: Counts IV, V VII
Counts IV, V, and VII (Interference Claims) of Plaintiff's Complaint[29] all rely on the Physician Defendants' alleged interference with BAMM's current and prospective contractual and business relations.[30] The Physician Defendants argue that summary judgment is proper as to the Interference Claims because there is insufficient evidence from which a trier of fact could infer that Physician Defendants either interfered with or participated in St. Joseph's decision to terminate the BAMM Agreement. See Defs.' Summ. J. Br. 14-15. Moreover, they contend that *Page 17 
Plaintiff has failed to provide sufficient evidence of intentional or improper acts of interference by the Physician Defendants.Id. at 18.
Considering the evidence as a whole and in a light most favorable to the Plaintiff, the Court finds that a genuine issue of material fact exists as to whether the Physician Defendants intentionally and improperly interfered with BAMM's present and future contractual relations with St. Joseph. Although the Physician Defendants aver that no disputed issue remains in light of Fogarty and Stinton's testimony that they were not involved in BAMM's termination, the Court finds that when the timing of events, the party's actions, and the statements allegedly made, are viewed as a whole, a reasonable trier of fact could find intentional and improper interference by the Physician Defendants.
In support of its Interference Claims, BAMM has presented evidence that representatives of St. Joseph contacted Vantage — despite the exclusivity provision of the BAMM Agreement — after conversations with Colagiovanni. See Allonge Aff. ¶ 4. Moreover, after BAMM provided the Physician Defendants with the Confidential Information and their negotiations came to an impasse, the Physician Defendants were able to obtain a similar deal with Vantage that was contingent upon Vantage reaching an agreement with St. Joseph. See Pl.'s Opp'n Br. Ex. J.
Despite having committed BAMM to a 2007 operating room schedule in November 2006, and having negotiated an additional extension of the BAMM Agreement, in December and January — shortly after the MOA was finalized — St. Joseph suddenly ordered a re-evaluation and competitive rebid. While, the Physician Defendants have failed to provide any indication that a re-bid process took place, by January 2007 — one month after the MOA was finalized — Vantage's equipment was scheduled for a demonstration and a contract between Vantage and St. Joseph was being negotiated. Colagiovanni, Olsson, and Fogarty all testified that the occurrence *Page 18 
of these events generally indicated that Vantage had been or would be chosen as St. Joseph's new lithotripsy vendor. See
Colagiovanni Dep. 20:13-21, Sept. 28, 2010; Olsson Dep. 22:6-9, Oct. 1, 2010; Fogarty Dep. 38:1-14, Apr. 9, 2010.
Moreover, Vantage and St. Joseph Hospital worked with Colagiovanni to establish an agreement. See Allonge Aff. ¶ 5. In fact, following the execution of the MOA, the evidence indicates that the Physician Defendants held meetings and had discussions with Vantage regarding their partnership and the status of the negotiations between Vantage and St. Joseph. See Pl.'s Opp'n Br. Exs. P, V, Z, BB; Colagiovanni Dep. 49:13-51:2, Sept. 28, 2010.
BAMM further points to numerous statements to further support its Interference Claims. Through affidavits and deposition testimony, BAMM alleges that Colagiovanni not only threatened to disclose its Confidential Information, but also to take his lithotripsy business to a competing surgical center if St. Joseph continued its relationship with BAMM. See Mercurio Dep. 168:7-15, Apr. 29, 2010. In addition to these threats, (1) Colagiovanni told McShane that he did not want use BAMM's machines anymore — despite believing them to be the best machines — because he did not want to make more money for BAMM; (2) Olsson told McShane that BAMM's contract "had been taken care of" and would be out of St. Joseph in three weeks; and (3) Squillante told Mercurio that "it was all being done at Dr. Colagiovanni's request." See Mercurio Dep. 158:21-164:3, Apr. 29, 2010; McShane Aff. ¶¶ 3, 5.
As a result, despite the testimony proffered by the Physician Defendants stating that they were not involved with the decision to terminate BAMM, the Court finds that when viewed in its entirety and in the proper light, the evidence elicited in the affidavits and testimony raises a genuine issue of fact as to whether the Physician Defendants intentionally and improperly interfered with BAMM's present and future contractual and business relations. In view of the *Page 19 
conflicting evidence and disputed issues of material fact, it is clear that summary judgment is not appropriate with respect to the Interference Claims.
 C Civil Conspiracy Claim: Count IX
As part of Count IX (Conspiracy Claim) of its Complaint, BAMM alleges that there was an agreement between the Physician Defendants and St. Joseph, the purpose of which was to accomplish an unlawful objective or lawful objective by unlawful means. See
Complaint. The Physician Defendants and St. Joseph allege that summary judgment is proper as to the Conspiracy Claim because no evidence exists of any wrongdoing or conspiratorial agreement amongst the parties.
To establish a claim of civil conspiracy, a party must establish that "(1) there was an agreement between two or more parties and (2) the purpose of the agreement was to accomplish an unlawful objective or to accomplish a lawful objective by unlawful means."Smith v. O'Connell, 997 F. Supp. 226, 241 (D.R.I. 1998);ERI Max Entm't, Inc. v. Streisand,690 A.2d 1351, 1354 (R.I. 1997) (per curiam) (citing Stubbs v.Taft, 88 R.I. 462, 468, 149 A.2d 706, 708 (1959)). In fact, the actors must agree on the object or course of action. Moss v. CampPemigewassett, Inc., 312 F.3d 503, 512 (1st Cir. 2002).
However, in order to prove a civil conspiracy, [31] a claimant need not produce direct evidence of an explicit agreement by the parties. DM Research v. College of Am. Pathologists,2 F. Supp.2d 226, 229 (D.R.I. 1998). *Page 20 
Rather, a Court may reasonably infer a conspiracy "from the actions of the alleged conspirators . . . `when a theory of rational, independent action is less attractive than that of concerted action.'" Id. (quoting Kreuzer v. American Acad. ofPeriodontology, 735 F.2d 1479, 1487 (D.C. Cir. 1984)).
Considering the evidence in a light most favorable to the Plaintiff, this Court finds that sufficient evidence exists from which a trier of fact could infer that a civil conspiracy existed between the Physician Defendants and St. Joseph. Although BAMM does not have direct evidence of a civil conspiracy, the Court finds that through affidavits and deposition testimony, it has established that a dispute as to a material issue of fact exists. In fact, Plaintiff's evidence indicates that as early as June 2006, Fogarty inappropriately contacted Colagiovanni to inform him that the BAMM Agreement expired in December 2006. See Pl.'s Opp'n Br. Ex. D; Fogarty Dep. 61:11-24, Apr. 9, 2010.
Moreover, despite having already committed BAMM to the 2007 operating calendar and negotiated an extension of the BAMM Agreement, St. Joseph proceeded to negotiate with Vantage. While, St. Joseph claims it entered into an agreement with Vantage after undergoing an objective evaluation and re-bid, neither Fogarty nor the Physician Defendants have produced any evidence of such a process. See Fogarty Dep. 26:16-27:18, Apr. 9, 2010. In fact, despite ordering the re-bid on December 8, 2006, the Physician Defendants and St. Joseph's actions indicated that — as early as December or January — Vantage would be St. Joseph's new lithotripsy *Page 21 
vendor. See Pl.'s Opp'n Br. Ex. K, Q; Colagiovanni Dep. 20:13-21, Sept. 28, 2010; Olsson Dep. 22:6-9, Oct. 1, 2010; Fogarty Dep. 38:1-14, Apr. 9, 2010. For the Court, these actions raise reasonable inferences of improper intentional interference particularly when viewed in light of Colagiovanni's threat that he would take his lithotripsy business to a competing surgical center if St. Joseph continued with BAMM. See Mercurio Dep. 168:7-15, Apr. 29, 2010.
Fogarty's actions also raise a question as to whether a conspiracy existed. Plaintiff points out that Fogarty ordered an immediate trial of Vantage's equipment and later instructed an offsite trial, despite the fact that it was not typical for him to get involved with the demonstration of equipment. See Fogarty Dep. 47:14-19, Apr. 9, 2010; Squillante Dep. 7:16-20, Sept. 1, 2010; Pl.'s Opp'n Br. Ex. X. Moreover, despite expressing concerns about indemnifying Vantage, and stating "I can't imagine we'd do this for any equip [sic] vendor," Fogarty agreed to the indemnity.See Pl.'s Opp'n Br. Exs. AA CC.
Therefore, in light of the Plaintiff's evidence, the Court finds that a trier of fact could reasonably infer that a civil conspiracy to inappropriately and tortiously terminate BAMM existed between St. Joseph and the Physician Defendants. After viewing the evidence presented in connection with this summary judgment proceeding, the Court is satisfied that reasonable inferences could be drawn by the trier of fact — from the evidence as a whole — to establish that the parties acted tortiously and unlawfully in order to terminate BAMM. As a result, the Court denies the Physician Defendants and St. Joseph's request for summary judgment as to Count IX.
 IV Conclusion
After due consideration of all the evidence, together with the arguments advanced by counsel at the hearing and in their memoranda, the Court denies the Physician Defendants and *Page 22 
St. Joseph's request for summary judgment as to the Breach Claims, Interference Claims, and Conspiracy Claims. Although Plaintiff has failed to proffer direct evidence of disclosure, interference, or a conspiracy, the Court finds that when considered as a whole, BAMM has presented sufficient circumstantial evidence from which a trier of fact could draw reasonable inferences as to these claims. As a result, the Court holds that because genuine issues of material fact are disputed, the instant matter is not ripe for summary judgment. Moreover, in light of the determinations contained herein, the Court denies the Physician Defendants' request for attorney's fees under both Super R. Civ. P. 11 and G.L. 1956 § 9-1-45.
Prevailing counsel may present an order consistent herewith which shall be settled after due notice to counsel of record.
[1] Colagiovanni is also the former President of the Medical Staff at St. Joseph, is currently on St. Joseph's Board of Trustees (Board), and is a major donor. (Colagiovanni Aff. ¶ 3; Colagiovanni Dep. 21:8-22:23, Sept. 28, 2010.) Olsson joined CIU in 2004. (Olsson Aff. ¶ 4.)
[2] Lithotripsy is the non-invasive treatment of kidney stones, using, among other things, specialized lithotripsy treatment machines. (Colagiovanni Aff. ¶ 5.)
[3] The Court notes that the BAMM Agreement provided that "for the duration of [the] agreement," BAMM "[was] the sole source provider to [St. Joseph] for lithotripsy services." (Pl.'s Opp'n Br. Ex. C. ¶ 11.)
[4] At the time, Colagiovanni was a member of Cambio's urology practice. (Mercurio Dep. 62:8-11, Apr. 29, 2010.)
[5] At that time, the offering price of a membership unit in BAMM, in accordance with applicable regulatory guidelines, was approximately $1500 per membership unit. (Mercurio Aff. ¶ 6.)
[6] The membership of Quaker Lane Investors consisted of Cambio, Drs. Brian McLeod and Vincent Catallozzi, and Paul Carey. (Mercurio Aff. ¶ 7.)
[7] Although executed on December 23, 2005, the Extension Agreement was effective as of October 1, 2005, with the base term lasting until December 31, 2006. (Pl.'s Opp'n Br. Ex. C.)
[8] The Court also notes that this disclosure may have been in derogation of St. Joseph's Conflict of Interest Policy (Conflict Policy). See Pl.'s Opp'n Br. Ex. B. According to the Conflict Policy the improper use of inside information is defined as "[the disclosure] or use [of] information relating to the Corporation's business, including but not limited to methods of operation and research and product development, for personal profit or advantage, or to divulge confidential information in advance of official authorization of its release." Id. at 5.
[9] According to the terms of the Confidentiality Agreement, Confidential Information included
 "all documents, materials and information provided by BAMM to Olsson, Colagiovanni, CIU, Zizza or TCU under this Agreement regarding the proposed Arrangement, including, without limitation, contracts, formal documents, marketing plans, business plans and projections, patients lists, financial statements, appraisals, depersonalized patient data and other materials which contain written or other physically embodied information related to BAMM's organizational structure, business or operations." See Pl.'s Opp'n Br. Ex. F ¶ 1.
Furthermore, the parties agreed to "hold all Confidential Information provided to them in trust and confidence and [to] refrain from using or disclosing any or all of said Confidential Information for any purpose other than for evaluating the desirability of the Arrangement." See Pl.'s Opp'n Br. Ex. F ¶ 3. The parties were not to
 "sell, assign, lease, license, disclose, give, or otherwise transfer or use in any way any Confidential Information or any copy thereof provided to them to any person or entity other than their own agents, partners, employees and consultant who have a need to know such information in order to enable said party to evaluate the desirability of the Arrangement." Id.
[10] BAMM provided the Physician Defendants with (1) BAMM's procedural statistics; (2) a history of BAMM's charges to St. Joseph and the number of patients treated; (3) BAMM's valuation analysis and financial information; and (4) the BAMM Agreement.
[11] According to BAMM, as part of these negotiations, Colagiovanni and his associates sought to purchase membership shares in accordance with the terms of the "original offering" despite federal regulations requiring that membership units be purchased for fair market value. See Colagiovanni Dep. 32:5-33:19, Sept. 28, 2010. BAMM offered to structure a buy-in for Colagiovanni, Olsson, and Zizza that would require them to pay $10,000 upfront and then utilize distributions to pay the fair market value over time. Id. Mercurio alleges that Colagiovanni threatened to disclose BAMM's Confidential Information to competitors if BAMM failed to provide Colagiovanni, Olsson, and Zizza with membership units at the rate previously offered. (Mercurio Aff. ¶ 14.)
[12] Similar to BAMM, Vantage specialized in extracorporeal shockwave lithotripsy. (Allonge Aff. ¶ 3.) Vantage would sell the lithotripsy equipment to urology partnerships who then rented the equipment to hospital and surgery centers to use in the treatment of their own patients. Id.
[13] Gerald Allonge, Vantage's Chief Executive Officer, alleges that in Fall 2006, Vantage was contacted by representatives of St. Joseph through Counter Pulsations with whom Vantage had a marketing agreement. (Allonge Aff. ¶ 4.) Allegedly, representatives of St. Joseph, through conversations with Colagiovanni, had become aware that there was an opportunity for Vantage to become the lithotripsy vendor at St. Joseph. Id. According to Allonge, it was only after St. Joseph's initial call that Breinig contacted Stinton.Id.
[14] The Court notes that while these negotiations ensued, St. Joseph committed BAMM to an operating room schedule for the 2007 calendar year. See Lapierre Aff. ¶¶ 5-7. St. Joseph confirmed BAMM's 2007 schedule on November 22, 2006. Id.; Pl.'s Opp'n Br. Ex. I. BAMM and St. Joseph also negotiated an new extension of the original BAMM Agreement for an additional 15 month term with automatic rollovers. See Pl.'s Opp'n Br. Ex. L.
[15] Colagiovanni claims that he neither negotiated the price of the membership shares reflected in the MOA nor had knowledge that the MOA was contingent upon Vantage securing a contract with St. Joseph. See Colagiovanni Dep. 29:15-30:3, 33:16-22, Sept. 28, 2010.
[16] The Court notes that Colagiovanni and Olsson testified that St. Joseph arranges equipment trials only after it has identified a vendor. See Colagiovanni Dep. 20:13-21, Sept. 28, 2010; Olsson Dep. 22:6-9, Oct. 1, 2010.
[17] While Fogarty testified that an objective evaluation was conducted (Fogarty Dep. 21:19-22:2, Sept. 24, 2010), Katherine Squillante, Director of Surgical Services and the employee with whom Stinton was directed to follow-up about the re-bid process, testified that after November 1, 2006 there was neither a pricing evaluation process nor a product evaluation committee established for vendors other than Vantage. See Squillante Dep. 21:14-22, 34:12-16, Sept. 1, 2010; see also Stinton Dep. 142:22-146:1, Aug. 22, 2007.
[18] The trial of the Vantage equipment was scheduled for January 11, 2007. See Breinig Dep. 81:10-16, Feb. 6, 2008.
[19] According to Mercurio, when he contacted St. Joseph and informed Squillante that the Vantage evaluation violated BAMM's contract with St. Joseph, she responded that "it was all being done at Dr. Colagiovanni's request." See Mercurio Dep. 158:21-164:3, Apr. 29, 2010.
[20] Fogarty testified that when a vendor was instructed to develop a contract it indicated that the evaluation process was close to completion and that the vendor had either been selected or was close to being selected. (Fogarty Dep. 38:1-14, Apr. 9, 2010.)
[21] Despite Vantage's hesitations, according to Martin McShane (McShane) — a BAMM employee — on January 15, 2007, Olsson told him that BAMM's contract had "been taken care of" and that BAMM would be out of St. Joseph in three weeks. See McShane Aff. ¶¶ 5-8. Additionally, Colagiovanni allegedly threatened that if St. Joseph continued with BAMM, he was going to take all of his business to Blackstone Valley Surgical Center. (Mercurio Dep. 168:7-15, Apr. 29, 2010; Colagiovanni Dep. 79:3-8, Sept. 28, 2010.)
[22] Although Fogarty testified that he does not normally get involved in equipment demonstrations during the procurement process (Fogarty Dep. 47:14-19, Apr. 9, 2010), Squillante stated that it was Fogarty who directed her to contact Colagiovanni to arrange for the offsite trial. (Squillante Dep. 14:13-16:1, Sept. 1, 2010.)
[23] According to the Conflict of Interest Questionnaire and Disclosure Form, Colagiovanni did not inform St. Joseph of a potential financial interest in Vantage until November 19, 2007.See Pl.'s Opp'n Br. Ex. FF.
[24] Prior to executing the indemnification, Fogarty emailed Stinton expressing his concerns about the indemnity and stating "I can't imagine we'd do this for any equipt [sic] vendor."See Pl.'s Opp'n Br. Ex. AA.
[25] In addition to the indemnification, Vantage sought the inclusion of a provision that required Colagiovanni, Olsson, and Zizza to use Vantage equipment for the term of the contract.See Pl.'s Opp'n Br. Ex. DD; Fogarty Dep. 10:11-11:24, Sept. 24, 2010.
[26] The final decision to terminate the agreement between St. Joseph and BAMM was made by Fogarty based on recommendations from Stinton and Squillante, among others. See Stinton Dep. 185:8-187:5, Aug. 22, 2007; Fogarty Dep. 39:2-15, Sept. 24, 2007. Stinton testified that factors relevant to BAMM's termination were that: (1) the Vantage proposal was less expensive than the current BAMM agreement; (2) Vantage offered newer equipment than BAMM; and (3) BAMM had "burned [its] bridges" through its recent conduct. See Stinton Dep. 108:15-24, 117:23-120:9, 157:1-158:3, Aug. 22, 2007. Upon questioning by Cambio, Fogarty claimed that Vantage had been awarded the contract because its bid was determined to be "superior over all, after an objective evaluation as recommended by [the] purchasing department." Pl.'s Opp'n Br. Ex. N.
[27] Count I seeks (1) a declaration that the "Physician Defendants have, and continue, to engage in activity and/or conduct in direct violation of the Confidentiality Agreement," (2) injunctive relief against further disclosure by the Physician Defendants of the Confidential Information, and (3) an injunction compelling the Physician Defendants to return all Confidential Information disclosed to them during their business dealings with BAMM. See Complaint. Count II seeks a judgment finding that the Physician Defendants breached the Confidentiality Agreement. Id. Count VI seeks a judgment finding that the Physician Defendants have "misappropriated through improper means certain of BAMM's confidential and proprietary information, trade secrets, and/or other sensitive materials for their personal use and benefit, and to the detriment of BAMM" in violation of Rhode Island's Uniform Trade Secrets Act (UTSA), G.L. 1956 § 6-41-1, et seq. Id.
[28] The UTSA defines a trade secret as
 "information, including a formula, pattern, compilation, program, device, method, technique, or process, that:
 (i) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
 (ii) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Sec. 6-41-1.
The Physician Defendants do not dispute that the Confidential Information disclosed to them pursuant to the Confidentiality Agreement were trade secrets under the UTSA.
[29] Count IV seeks a judgment finding that the Physician Defendants tortiously interfered with BAMM's business relationships in connection with its business operations. See Complaint. Count V seeks a judgment finding that the Physician Defendants tortiously interfered with BAMM's contractual relationship with St. Joseph. Id. Count VII seeks a judgment finding that the Physician Defendants have tortiously interfered with or authorized the tortious interference with BAMM's prospective business relations. Id.
[30] To prevail on a claim of tortious interference with contractual relations (Count V), a party must show `(1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) his [or her] intentional interference; and (4) damages resulting therefrom.' Belliveau Bldg. Corp. v.O'Coin, 763 A.2d 622, 627 (R.I. 2000) (quoting SmithDev. Corp. v. Bilow Enters., Inc.,112 R.I. 203, 211, 308 A.2d 477, 482 (1973)). Additionally, although no showing of actual malice is necessary, at a minimum a party must establish an intent to do harm without justification.See Jolicoeur Furniture Co. v. Baldelli,653 A.2d 740, 753 (R.I. 1995). Our Supreme Court has stated that the elements of intentional interference with prospective business advantage (Count IV) "are identical to those required to state a claim based on interference with contractual relations, except for the requirement in the latter that an actual contract exists."Mesolella v. City of Providence,508 A.2d 661, 669-70 (R.I. 1986) (citing Smith,112 R.I. at 211, 308 A.2d at 482) (stating that the elements of interference with prospective business advantage and prospective contractual relations (Count VII) are "(1) the existence of a business relationship or expectancy, (2) knowledge by the interferer of the relationship or expectancy, (3) an intentional act of interference, (4) proof that the interference caused the harm sustained, and (5) damages to the plaintiff"). Our Supreme Court recently clarified that the mere existence of intentional interference is not enough; there must be an "intentional and improper" interference. Avilla v. Newport Grand Jai Alai,LLC, 935 A.2d 91, 98-99 (R.I. 2007); see alsoBelliveau, 763 A.2d at 627 (stating that the plaintiff bears the initial burden of showing that the interference was not legally privileged or justified, and after the plaintiff has met its burden, the burden shifts to the defendant to show justification).
[31] Civil conspiracy is not an independent basis of liability, but a means of establishing joint liability for other tortious conduct. Guilbeault v. R.J. Reynolds Tobacco Co.,84 F. Supp.2d 263, 268 (D.R.I. 2000); Read Lundy, Inc. v. WashingtonTrust Co. of Westerly, 840 A.2d 1099, 1102-03 (R.I. 2004). It "requires a valid underlying intentional tort theory."Id.; Beck v. Prupis,529 U.S. 494, 501-02, 120 S. Ct. 1608, 1614 (2000) (quotingJ. C. Ornamental Iron Co. v. Watkins,152 S.E.2d 613, 615 (Ga. 1966)) (stating that "[a claimant] must allege all the elements of a cause of action for the tort the same as would be required if there were no allegation of a conspiracy"). "The mere common plan, design or even express agreement is not enough for liability in itself, and there must be acts of a tortious character in carrying it into execution." Beck,529 U.S. at 501, 120 S. Ct. at 1614 (quoting 4 Restatement (Second)Torts § 876, comment b (1977)).